### CITY OF GALLATIN

v.

### CHEROKEE COUNTY.

No. TY–81–107–CA.

United States District Court,
E.D. Texas,
Tyler Division.

Jan. 17, 1983.

John O. Davis, A.D. Henderson, Palestine, Tex., Mike Hatchell (for appeal purposes), Ramey, Flock, Hutchins, Jeffus, McClendon & Crawford, Tyler, Tex., for plaintiff.

Larry R. Sinclair, Rusk, Tex., John Robert Adamson, Jacksonville, Tex., for defendant.

*Memorandum Opinion*

JUSTICE, Chief Judge.

The plaintiff, the City of Gallatin, Texas, has brought this civil action under the "citizen suit" provision of the Resource Conservation and Recovery Act of 1976, *as amended* ("RECRA"). 42 U.S.C. § 6972(a), § 6901, *et seq.* In its complaint, plaintiff alleges that the defendant, Cherokee County, Texas, is constructing an "open dump", which is prohibited by RECRA at 42 U.S.C. § 6945(a). Defendant's proposed municipal solid waste disposal site is an "open dump", plaintiff charges, because there is a "reasonable probability [that it will have] adverse effects on health and the environment." 42 U.S.C. § 6944(a). Specifically, it is alleged by plaintiff that contaminated water will seep out of the landfill and pollute potable ground water and surface water beyond the perimeters of the landfill site. *See* 40 C.F.R. § 257.3–3 to § 257.3–4.

Defendant contends that whatever contaminated water may collect in the landfill site will be adequately contained on the site by a three-foot compacted clay liner that is being installed in the floor of the pit; that any matter that may leak through the liner (called "leachate") will not flow in the direction of known off-site sources of drinkable ground water or surface water; and, further, that any leachate that may ultimately wend its way into sources of drinking water will not be contaminated.

This case came to trial September 21–23, 1981, with the bulk of the evidence being directed to the question of the sufficiency

of the clay liner to contain contaminated water. The evidence was highly technical and contradictory.

■ At the time of trial, the parties were aware of no published case in which a citizen's suit had been brought to enforce 42 U.S.C. § 6945(a), or, indeed, any other provision of RECRA pertaining to non-hazardous waste. Throughout the trial, both parties acted on the assumption that the statute in question was, in fact, a direct federal prohibition of "open dumping." Several months prior to trial one Federal court had, in fact, so interpreted § 6945(a). *O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 642 (E.D.Pa.1981). Nevertheless, upon close inspection of the statute, it has been respectfully concluded·that the precedent cannot be followed, and that the parties have misinterpreted the meaning, scope, and application of § 6945(a).

## II.

### *The RECRA Legislation*

Congress first acknowledged the threat to public health and welfare posed by the problem of solid waste by enacting P.L. 89–272, the Solid Waste ·Disposal Act of 1965. This legislation authorized the Secretary of Health, Education and Welfare to conduct research into techniques of solid waste disposal, and to provide financial and ·technical assistance to states in implementing safe solid waste disposal plans. Subsequently, in the Resource Recovery Act of 1970, Congress encouraged the recovery of reusable materials and energy from solid waste, and it transferred federal responsibility for administration of the Act to the newly created Environmental Protection Agency ("E.P.A.").[1]

The Resource Conservation and Recovery Act of 1976 marked the first direct federal regulation in the field of solid waste. The regulatory provisions of the Act appear to be restricted, however, to that particularly

toxic subclass of solid wastes categorized as "hazardous wastes." *See* subchapter III of the Act, 42 U.S.C. §§ 6921–6931. The problem of non-hazardous municipal and industrial solid waste, on the other hand, appears to have been attacked through an incentives system, whereby the granting of federal funds would be conditioned upon a state's implementation of solid waste disposal plans complying with minimum federal standards. *See* subchapter IV of the Act, 42 U.S.C. §§ 6941–6949.

The House Report of the Committee on Interstate and Foreign Commerce, which reported favorably on the bill that eventuated in RECRA, evinces three legislative motives for adopting this divergent approach to the dual problems relating to the disposal of hazardous and non-hazardous waste. First, it was recognized that hazardous waste disposal presented the more exigent and intractable health hazard.

> The overriding concern of the Committee, however, is the effect on the population and the environment of the disposal of discarded hazardous wastes—those which by virtue of their composition or longevity are harmful, toxic or lethal. Unless neutralized or otherwise properly managed in their disposal, hazardous wastes present a clear danger to the health and safety of the population and to the quality of the environment.

House Report No. 94–1491 (H.R. 14496), 94th Cong., 2d Sess., p. 3 (1976), *reprinted in* 5 U.S.Code Cong. & Adm.News ("U.S.C.C.A.N.") 6238, 6241 (1976). *See also* 42 U.S.C. § 6901(b)(5).

Second, it was recognized that the existing federal programs, which encouraged techniques of resource recovery, were largely inapplicable to the threats posed by hazardous wastes; moreover, any sort of "incentives program" was likely to fail by reason of the high costs connected with the disposition of hazardous wastes.

---

1. For a brief history of the acts, *see, e.g.,* H.R. Report No. 96–191 (H.R. 3394), Committee on Interstate and Foreign Commerce, 96th Cong., 1st·Sess., p. 4 (1979). (Legislative history of the Solid Waste Disposal Act Amendments of 1980.) For a lengthy history, *see* W. Kovacs and J. Klucsik, The New Federal Role in Solid Waste Management: The Resource Conservation and Recovery Act of 1976, 3 Col.J. Envir.L. 205 (1977).

However appealing the resource recovery solution to the discarded materials problem may appear, other aspects of the problem, associated with the disposal of hazardous wastes do not have the same attractive qualities. In order to solve this aspect of the problem the Committee recommends a regulatory approach. Hazardous wastes typically have little, if any, economic value; are often not susceptible to neutralization; present serious danger to human life and the environment; and can only be safely stored, treated or disposed of at considerable cost to the generator. Without a regulatory framework, such hazardous waste will continue to be disposed of in ponds or lagoons or on the ground in a manner that results in substantial and sometimes irreversible pollution of the environment.

5 U.S.C.C.A.N. at 6241.

Third, in RECRA, Congress was regulating in the field of waste disposal for the first time, for this area had, until 1976, been included within the exclusive regulatory powers of the states. In this initial excursion, Congress' restraint outside the narrow field of hazardous waste seems to reflect misgivings concerning the limits of its constitutional powers. *See also* 42 U.S.C. § 6975 (separability clause). The House Report observes (in language which is cited solely as a barometer of legislative intent):

> Generally, hazardous waste is more likely to be the subject of interstate transportation than is non-hazardous industrial and municipal waste.

5 U.S.C.C.A.N. at 6247.

For all of the foregoing reasons, Congress appears to have adopted a markedly more circumspect approach to the problem of non-hazardous solid waste disposal than to that of hazardous waste disposal. The House Report outlines the Committee's impression of what the role of the federal government would be in supervising non-hazardous waste disposal in these terms:

> The primary functions of the Office of Discarded Materials [of the E.P.A.] will be to develop *reasonably flexible* guidelines for State ... discarded materials

plans. Such plans will prohibit open dumping and promote rehabilitation of existing open dumps. In addition to publishing guidelines, the Administrator will have authority to make grants to state or local governments for the planning and enforcement of their discarded materials plan. Further, technical assistance will be available to local and state governments .... The Federal guidelines published pursuant to Title [subchapter] IV are *not mandatory upon the states;* however, if a state seeks Federal financial assistance to develop a discarded materials plan, then such state is required to meet the Federal guidelines. [Emphasis added. 5 U.S.C.C.A.N. at 6242.]

It is the Committee's intention that federal assistance should be an incentive for state and local authorities to act to solve the discarded materials problem. At this time federal preemption of this problem is undesirable, inefficient, and damaging to local initiative.

... If these objectives are not met, the states and local authorities within the states will lose the federal or technical assistance. However, the provisions of this legislation specifically do not authorize the federal government to take over the responsibility for discarded materials disposal planning .... [5 U.S.C.C.A.N. at 6271.]

It is the Committee's intent that the federal government will provide the technical assistance necessary for the states in cooperation with their own local governments, to develop an adequate regional system and the ability to implement such a system for the disposal of waste, without the federal government becoming additionally involved in the affairs of state or local government.

5 U.S.C.C.A.N. at 6278.

That Congress did, in fact, adopt a bifurcated approach in its treatment of hazardous and non-hazardous waste is apparent from the Act's "findings," "objectives," and its substantive terms. In subchapter I of the Act, Congress announces a legislative "finding"

that while the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies, the problems of waste disposal as set forth above have become national in scope and in concern and necessitate Federal action through financial and technical assistance and leadership in the development, demonstration, and application of new and improved methods and processes to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid waste disposal practices.

42 U.S.C. § 6901(a)(4). In the same subchapter, Congress specifically "finds" that

hazardous waste presents, in addition to the problems associated with non-hazardous waste, special dangers to health and requires a greater degree of regulation than does non-hazardous solid waste.

42 U.S.C. § 6901(b)(5). *Cf.* 42 U.S.C. § 6901(b)(4).

Subchapter III of RECRA, entitled "Hazardous Waste Management," establishes a comprehensive regulatory system governing the generation, transportation and disposal of hazardous waste. 42 U.S.C. §§ 6921–6931. It requires owners and operators of hazardous waste disposal sites to seek and obtain permits from the federal government, 42 U.S.C. § 6925; it authorizes the E.P.A. to inspect such sites for compliance with federal regulations, 42 U.S.C. § 6927; and it creates civil and criminal penalties for violation of the various provisions of the subchapter. 42 U.S.C. § 6928(d), (e), and (g).

Subchapter IV of RECRA, entitled "State or Regional Solid Waste Plans," sets forth its objectives as follows:

The objectives of this subchapter are to assist in developing and encouraging methods for the disposal of solid waste which are environmentally sound and which maximize the utilization of valuable resources and to encourage resource conservation. Such objectives are to be accomplished through Federal technical and financial assistance to States or regional authorities for comprehensive planning pursuant to Federal guidelines designed to foster cooperation among Federal, State, and local governments and private industry.

42 U.S.C. § 6941.

The subchapter obviously seeks to achieve these objectives, by making federal funds available to states that submit state solid waste disposal plans which comply with certain minimum federal requirements. 42 U.S.C. §§ 6943–6947. Federal funds are also made available to help the state develop such a plan. 42 U.S.C. § 6948.

At § 6943, entitled, "Requirements for approval of plans," the Act provides:

(a) *Minimum requirements.*—In order to be approved under section 6947 of this title, each State plan must comply with the following minimum requirements— (1) The plan shall identify ... (A) the responsibilities of State, local, and regional authorities in the implementation of the State plan, (B) the distribution of Federal funds to the authorities responsible for development and implementation of the State plan, and (C) the means for coordinating regional planning and implementation under the State plan.

(2) The plan shall, in accordance with section 6944(b) and 6945(a) of this title, prohibit the establishment of new open dumps within the State and contain requirements that all solid waste (... not including hazardous wastes) shall be (A) utilized for resource recovery or (B) disposed of in sanitary landfills (within the meaning of section 6944(a) of this title) or otherwise disposed of in an environmentally sound manner.

(3) The plan shall provide for the closing or upgrading of all existing open dumps within the State pursuant to the requirements of section 6945 of this title.

(4) The plan shall provide for the establishment of such State regulatory powers as may be necessary to implement the plan.

. . . . .

42 U.S.C. § 6943.

The next section, § 6944, although somewhat repetitive, expands upon the nature of

the prohibition of open dumping to be required of state plans:

(a) *Criteria for sanitary landfills.*—Not later than one year after October 21, 1976, after consultation with the States, and after notice and public hearings, the Administrator shall promulgate regulations containing criteria for determining which facilities shall be classified as sanitary landfills and which shall be classified as open dumps within the meaning of this chapter. At a minimum, such criteria shall provide that a facility may be classified as a sanitary landfill and not an open dump only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility. Such regulations may provide for the classification of the types of sanitary landfills.

(b) *Disposal required to be in sanitary landfills, etc.*—For purposes of complying with section 6943(2) of this title, each state plan shall prohibit the establishment of open dumps and contain a requirement that disposal of all solid waste within the State shall be in compliance with such section 6943(2).

(c) *Effective date.*—The prohibition contained in subsection (b) of this section shall take effect on the date six months after the date of promulgation of regulations under subsection (a) of this section or on the date of approval of the State plan, whichever is later.

42 U.S.C. § 6944.

This much of the Act is, of course, relatively clear. The ambiguous provision bringing this lawsuit to a head is 42 U.S.C. § 6945, *as amended,* which reads thus:

(a) *Closing or upgrading of existing open dumps.*—Upon promulgation of criteria under section 6907(a)(3) of this title any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section. For purposes of complying with section 6943(a)(2) and 6943(a)(3) of this title, each State plan shall contain a requirement that all existing disposal facilities or sites for solid waste in such State which are open dumps listed in the inventory under subsection (b) of this section shall comply with such measures as may be promulgated by the Administrator to eliminate health hazards and minimize potential health hazards. Each such plan shall establish, for any entity which demonstrates that it has considered other public or private alternatives for solid waste management, to comply with the prohibition on open dumping and is unable to utilize such alternatives to so comply, a timetable or schedule for compliance for such practice or disposal of solid waste which specifies a schedule of remedial measures, including an enforceable sequence of actions or operations, leading to compliance with the prohibition on open dumping of solid waste within a reasonable time (not to exceed 5 years from the date of publication of criteria under section 6907(a)(3) of this title).

(b) *Inventory.*—To assist the States in complying with section 6943(a)(3) of this title, not later than one year after promulgation of regulations under section 6944 of this title, the Administrator ... shall publish an inventory of all disposal facilities or sites in the United States which are open dumps within the meaning of this chapter.

42 U.S.C. § 6945.

Arguably, section 6945(a) is a direct, self-executing, federal prohibition on open dumping by anyone in any state, regardless of whether or not that state has proposed a state plan seeking funds under § 6947. Both parties to this lawsuit have apparently so interpreted it. As has been noted, one federal district court has construed § 6945(a) in this manner. *O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 642 (E.D.Pa. 1981). See discussion at p. 948, *infra. See also* 42 U.S.C. § 6901(b)(4) and 6902(3). In support of this view, it might be contended that § 6945 would be mere

surplusage, if it only accomplished what § 6943(a)(2)–(3) and § 6944(b) already provided for, *i.e.,* the conditioning of federal funding upon a state commitment to prohibit open dumping within the State. Ordinarily, of course, a court will avoid a construction of a statute that reduces a word or phrase to surplusage. *State Fair of Texas v. U.S. Consumer Product Safety Com'n,* 650 F.2d 1324, 1330 (5th Cir.1981), *vacated* 454 U.S. 1026, 102 S.Ct. 560, 70 L.Ed.2d 470 (1981); *U.S. v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972).

On the other hand, such an interpretation attributes to § 6945(a) an effect extending far beyond the stated objectives of the subchapter. *See* § 6941. More importantly, it is extremely difficult to formulate a theory regarding the manner in which such a prohibition would be enforced. Unlike the subtitle III prohibitions concerning hazardous wastes, this prohibition carries with it no civil or criminal penalties for its violation. There is no requirement that owners and operators of solid waste disposal facilities seek federal permits before establishing new disposal sites. Further, there is no authorization for the E.P.A. to inspect disposal sites for compliance with the prohibition. Finally, the prohibition in § 6945(a) takes effect "[u]pon promulgation of criteria under section 6907(a)(3) of this title," criteria that are there described as "*suggested guidelines . . . to be used by the States* to define those solid waste management practices which constitute the open dumping of solid waste or hazardous waste and are to be prohibited under subtitle D [subchapter IV] of this Act." (Emphasis added.) 42 U.S.C. § 6907(a)(3). The question arises as to the effect of a federal prohibition against an activity that is to be defined by the state. Nowhere does the Act explain the distinction, if any, between the "regulations" authorized by § 6944(a), used to guide compliance with § 6943(a)(2), and the "suggested guidelines" authorized by § 6907(a)(3), which demarcate conformance with § 6945(a). The final sentence of § 6945(a) implies that the criteria promulgated under § 6907(a)(3) would also be used to interpret congruity with § 6943(a)(2).

The language of § 6944(a) declares that the criteria promulgated thereunder will define the term "open dumping" for the purposes of "this chapter," which would, of course, embrace both § 6943(a)(2)–(3) and § 6945(a). The E.P.A. has promulgated one set of "criteria" under both § 6944(a) and § 6907(a)(3). *See* 40 C.F.R. § 257 (published September 13, 1979).

No matter what interpretation is given to § 6945(a), then, surplusage and confusion will continue to exist. No reason appears why, if open dumping is banned directly by § 6945(a), it should be mentioned again specifically in the context of state plans in § 6943(a)(2)–(3) and § 6944(b). It is also to be noted that the promulgation of the inventory of open dumps under § 6945(b) is specifically limited in its objective of "assist[ing] the States in complying with Section 6943(a)(3)". If § 6945(a) directly prohibits open dumping in all states, such an inventory would be indispensable in assisting the states to comply with this subsection of § 6945.

Still more confusingly, if § 6945(a) creates a prohibition independent of § 6943(a)(2)–(3), it is difficult to discern when that prohibition would become effective. Congress foresaw that compliance with a prohibition of open dumping would take a considerable length of time, and it established, in the context of the § 6943(a)(2)–(3) prohibition, two provisions tailored to mitigate the abruptness of the burden imposed. First, it provided that the prohibition would not take effect until six months after promulgation of the criteria, or until the plan was approved by the E.P.A., whichever was later. 42 U.S.C. § 6944(c). Second, it provided that each state plan, "for the purposes of complying with section 6943(a)(2) and 6943(a)(3),"

> may establish a timetable or schedule for compliance for such practices or disposal of solid waste which specifies a schedule of remedial measures, including an enforceable sequence of actions or operations, leading to compliance with the prohibition on open dumping of solid waste within a reasonable time (not to exceed 5

years from the date of publication of criteria under section 6907(a)(3) of this title).

42 U.S.C. § 6945(a). No similar provisions modify the ostensible prohibition of § 6945(a). Thus, if § 6945(a) is an independent, self-executing prohibition on open dumping, it takes effect immediately upon promulgation of the criteria, with obviously unworkable consequences. *See* W. Kovacs and J. Klucsik, the New Federal Role in Solid Waste Management: The Resource Conservation and Recovery Act of 1976, 3 Col.J. Envir.L. 205, 234–236 and nn. 132–133 (1977) (concluding that Congress could not have intended § 6945(a) to enact an independent prohibition).[2] It would mean that, while E.P.A. and participating states would undertake the burden of carefully working out complex definitions of "open dumping" and comprehensive schedules and procedures for compliance, other states—those receiving no federal funds—would be immediately subject to a totally undefined and absolute prohibition. That such a scheme was intended is wholly inconceivable.

In viewing all of these provisions contextually, and in attempting to minimize surplusage and maximize coherence, it is simply not possible to ascribe to § 6945(a) the meaning that the parties have contended for. If § 6945(a) were the self-executing prohibition that the parties have postulated, then Congress would have made a deep foray into the direct regulation of non-hazardous waste; but this is in direct contradiction to its apparent intent, as evidenced by the remainder of the statute, to restrict direct federal intervention to the field of hazardous waste. Moreover, if federal courts can sit to determine whether a waste disposal site such as the one in Cherokee County—or any of the other approximately 1,150 such sites across Texas—qualifies as a sanitary landfill within the meaning of § 6944(a), they have effectively become the issuers of federal permits in the field of

non-hazardous solid waste disposal—permits that Congress declined to create.[3]

It is a settled canon of statutory construction that a court

will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature.

*Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974), *quoting Brown v. Duchesne,* 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595 (1857). *See also Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975), *quoting United States v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849) ("In expounding a statute, we must not be guided by a single sentence, or member of a sentence, but look to the provisions of the whole law, and to its object and policy.")

▮ Viewing RECRA as a comprehensive and harmonious whole, it is concluded that it was the will of Congress, as evidenced by the entirety of the Act and as corroborated by the relevant legislative history, that § 6943(a)(2)–(3) and § 6945(a) should be given the following constructions:

1. If a state's plan has been approved by the E.P.A. under § 6947, the state has an obligation to enforce a prohibition upon all open dumping within its borders. Supervision of the state's compliance with this obligation is to be exercised, in the first instance, by the E.P.A., through either the power of the purse, 42 U.S.C. § 6947(b)(3), or through its legal enforcement powers under § 6973 ("imminent hazard"), or, perhaps, by means of "citizen suits" brought under § 6972(a)(1). Private citizens are entitled to sue the Administrator of the

---

2. The authors cite estimates appearing in a House Report that "94 percent of the existing land disposal sites would not qualify as 'sanitary landfills.'" 3 Col.J. Envir.L. at 234.

3. Furthermore, courts would have to decide this question with no guidance as to how much deference, if any, to give to prior determinations of the same question by the state or by the E.P.A.

E.P.A. or the officials of the relevant state agency, for failure to perform any nondiscretionary duties arising under the Act. 42 U.S.C. § 6972(a). The prohibition on open dumping becomes effective upon approval of the plan, or six months after promulgation of the federal regulations, whichever is later. 42 U.S.C. § 6944(c). (Regulations were promulgated in 1979. *See* 40 C.F.R. § 257.) Compliance with the prohibition may, however, be spaced over several years, in accordance with a timetable authorized under § 6945(a).

2. Section 6945(a) creates no independently enforceable, self-executing federal prohibition on open dumping applicable to states that have not sought funds under § 6947. The language of § 6945(a) is not, however, mere surplusage, since it articulates a prohibition which states must agree to enforce under several different circumstances. States "must agree to comply" with § 6945(a), for instance, in order to qualify for federal funds to *develop* a state plan (prior to approval) under 42 U.S.C. § 6948(a)(2)(B); in order to qualify for federal funds to implement a state plan under 42 U.S.C. § 6947(b)(1); or in order to qualify for a reinstatement of federal funds, when federal approval of a state plan has been withdrawn under 42 U.S.C. § 6947(b)(3).

In *O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 642 (E.D.Pa.1981), as already observed, a federal district court arrived at conclusions inconsistent with those outlined above. In that case, a citizen brought suit against a landfill in a state that had not yet received E.P.A. approval for a state plan, 523 F.Supp. at 650 n. 7, but Judge Pollak concluded:

> ... I take Congress to mean ... that there is a prohibition, but the prohibition is obviated under the circumstance of a showing of compliance with a state plan.

523 F.Supp. at 660–651. That court understood its construction of § 6945(a) to be consistent with that of the E.P.A., the principal authority charged with implementing RECRA, as announced at 44 Fed.Reg. 45066, 45072 (1979). *See also* 46 Fed.Reg.

47048 (Sept. 23, 1981). The E.P.A.'s construction of the statute, while not controlling, is entitled to great weight. *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1960). Nevertheless, the E.P.A.'s construction will not be followed in this instance, since (1) it is in the nature of dictum, (2) it is internally inconsistent, and (3) it is incompatible with the legislative scheme enacted by Congress.

Judge Pollak deferred to the following portion of the E.P.A. statement.

> The open dumping prohibition is a provision of federal law which stands on its own, separate from the state planning program. In conjunction with the citizen suit provision the open dumping prohibition creates a Federal cause of action allowing citizens and States to seek relief in Federal Court for damaging solid waste management practices.

44 Fed.Reg. 45066, 45072.

The E.P.A.'s conclusion must be viewed in context. The E.P.A. was construing the statute in order to determine whether or not (1) the inventory of open dumps it is required to "publish" would itself be a determination of legal liability, and (2) whether that inventory would be used only in connection with state plans, or in connection with a general prohibition. It decided first that, because the Act gave it no "authority to enter on private property to take samples or to require reporting on the facility's environmental effects," 44 Fed.Reg. at 45071, it could not possibly be required to make an ultimate determination of legal liability, and, in fact, it could not even draw up the required inventories. The states would be required to compile the inventories, and the E.P.A. would merely *publish* them. Next, E.P.A. decided that the inventory provision could not be related to an independent prohibition of open dumping apart from state plans, because, as had just been decided, it would be necessary that the inventories be compiled by the states. Thus the language of the E.P.A. statement which immediately precedes the portion relied upon in *O'Leary* is of a markedly different tenor from it:

The language of subtitle D [subchapter IV] and its supporting legislative history clearly indicate that the Federal Government was to facilitate the development of State initiatives in this area. The removal of the Senate provisions for Federal enforcement of the open dumping prohibition in the final version of the Act underscores this point. Were EPA's publication of the inventory to constitute an Agency decision that each listed site is in violation of Federal law, EPA would be heavily involved in the administration of solid waste programs. EPA would have to carefully supervise the States in the conduct of the inventory. Were EPA to be ultimately responsible for the decision to list, it would have to carefully review State decision making, overruling decisions where appropriate. EPA does not believe that the Congress intended that EPA have such a central role in State solid waste management.

EPA concludes, therefore, that the inventory was not designed to be a decision on the open dumping issue. The inventory is an adjunct to the State planning process. It provides information to the public and helps the States in identifying their priorities. In publishing the inventory EPA is reporting on the first phase of the State planning effort and thus will include all facilities identified by the State. EPA will not add or remove facilities from the inventory.

44 Fed.Reg. at 45072. Plainly, then, E.P. A.'s remarks about the availability of citizen suits to enforce an independent prohibition on open dumping were unnecessary to explain or effect any action it was charged with performing. In that sense, it was dictum. Furthermore, the E.P.A.'s dictum was unreasonable, because it would be astonishing for Congress to have decided that E.P.A. "review [of] state decision making" would constitute excessive federal intervention in state affairs, while also providing that federal courts were free to engage in *de novo* review of the same state decision making. Courts, as institutions, are not better suited than administrative bodies for engaging in the initial geological, geophysical, and hydrological fact-finding required in this area, nor are they less intrusive. Finally, the E.P.A.'s interpretation clashes with the manifest import of the citizen suit provisions of RECRA. Those provisions forbid the commencement of a citizen suit until after the Administrator of the E.P.A. has been given sixty days notice of the alleged violation. 42 U.S.C. § 6972(b)(1). If the Administrator chooses during that period to initiate a civil or criminal action of her own to remedy the violation, the citizen may not proceed with his suit. 42 U.S.C. § 6972(b)(2). The E.P.A.'s interpretation of RECRA stands the citizen's suit provisions on their head, since it concludes that *only* citizens may enforce § 6945(a), and not the E.P.A.[4]

---

4. The position of the current E.P.A. on this particular civil action is not altogether clear. The E.P.A. was not a litigant in this case. The agency did make a statement at the opening of trial that "the consistent position of the government all along is that E.P.A. opposes any testimony by any witness [who works for the E.P.A.] as to this entire dispute." Records of Proceedings, p. 5. The E.P.A. apparently adopted this position to avoid any conflicts of interest, in view of the pendency before it of the issue of whether or not to approve the Texas state plan for solid waste disposal. Nevertheless, defendants introduced into evidence a letter from the Acting Regional Administrator for Region VI of the E.P.A., Frances Phillips, purporting to explain the position of the E.P.A. with regard to the proposed Cherokee County landfill site. That letter reads in part:

The State of Texas has primary responsibility for the enforcement of solid waste disposal laws. EPA provides the State with financial support through grants and also provides technical assistance and advice to local communities concerning solid waste disposal.

Members of my staff have contacted both the Texas Department of Health (TDH) and the Texas Department of Water Resources (TDWR) on this matter ....

As the primary enforcement authority under the solid waste management portion of the Resource Conservation and Recovery Act, TDH must ensure that sites selected for solid waste landfills will not contaminate the ground water. TDH has inspected the Cherokee County site on several occasions. [Actions and opinions of TDH on the matter are listed.] ... Finally, no hazardous waste will be permitted on the site.

The conclusions of this court, although they conflict with *O'Leary,* and with the interpretation of the E.P.A., find support in the only academic treatment of the question which has been brought to the court's attention, W. Kovacs and J. Klucsik, The New Federal Role in Solid Waste Management: The Resource Conservation and Recovery Act of 1976, 3 Col.J. Envir.L. 205, 234–236 (1977),[5] and, more importantly, in the only Court of Appeals gloss upon the question. The Court of Appeals for the District of Columbia Circuit has held (albeit in dictum):

> R[E]CRA amended the Solid Waste Disposal Act of 1965 in an attempt to deal comprehensively with the problem of solid waste disposal. RCRA provides for direct federal regulation of hazardous waste, but leaves to the states regulation of nonhazardous waste .... Any state that wishes to receive federal financial assistance in developing a waste management program must submit plans that comply with federal guidelines established by E.P.A.

*Chemical Mfrs. Ass'n v. E.P.A.,* 673 F.2d 507, 509 (D.C.Cir.1982).

■ The legal conclusions of this court have been reached in attempting to decide the concrete case or controversy that has been brought before the court. The provisions of a complex statutory scheme cannot fairly be construed in isolation from one another. *See Kokoszka v. Belford, supra.* Nevertheless, once the legal conclusions have been drawn, it becomes apparent that only a few of them are formally necessary for decision of this case. The other conclusions become *dicta.* Thus, the admonishment of Chief Justice Marshall should be heeded:

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.

*Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821).

## III.

### *Application of Legal Conclusions to this Case*

It has been here decided that, under § 6945(a), a state is not required to prohibit open dumping, unless it has sought federal funds under § 6947 and its plan for solid waste disposal has been approved by the E.P.A. At the opening of the third and final day of trial in this case, the court, *sua sponte,* inquired of the parties as to the existence in Texas of a "state plan" within the meaning of subchapter IV of RECRA. In response, Hector Mendieta, Director of the Permits Division, Bureau of Solid Waste Management, Texas Department of Health, stated that Texas had developed such a plan, that the plan had been submitted to the E.P.A. in January of 1981, and that it had not yet been approved at the time of his testimony. The court takes judicial notice, Rule 201, F.R.E. (since it is a matter of public record), that the E.P.A. has yet to approve the Texas plan. Accordingly, the prohibition on open dumping has not become effective in Texas, up to the present. 42 U.S.C. § 6944(c).

It follows from all of the foregoing that no authority exists at this time for this

... We concur with the State in its decision to proceed with the permit.

Defendant's Exhibit 6. Upon deposition, which she attended pursuant to a subpoena, Ms. Phillips stated that the letter "accurately states the position of the Environmental Protection Agency, Region Six, regarding the matter of what governmental agency has the primary enforcement authority under the Resource Conservation and Recovery Act," Phillips Deposition, p. 9, and also "regarding any probability for pollution of surface water or contamination of

ground water by the Cherokee County Solid Waste Landfill." Phillips Deposition, pp. 9–10.

5. After closely reviewing the circumstances surrounding passage of the Act, that article concludes that "no member of the House could have read" the version that was finally enacted. 3 Col.J. Envir.L. at 220 and n. 77. With this conclusion, Judge Pollak and I are both in complete accord. *See O'Leary,* 523 F.Supp. at 650, n. 6.

court to enjoin construction of the Cherokee County municipal solid waste disposal site. The case is not ripe for such an action, since the law upon which it is predicated has still to take effect in Texas.

Analysis might logically end here. However, for aught that is known to the court, the E.P.A. could approve the state plan in the immediate future. Justice—and also the policy favoring the conservation of judicial resources—demands that the parties, having fully litigated their case, learn whether or not, upon approval of the state plan, the City of Gallatin would be entitled to bring the identical suit against the County. Accordingly, that issue will be addressed.

It has been determined that § 6943(a)(2)–(3) creates an obligation upon a state to prohibit open dumping, if the E.P.A. has approved a "state plan" pursuant to § 6947, and that the E.P.A. is empowered to enforce that obligation, through its power to deny federal funding, 42 U.S.C. § 6947(b)(3), or through its power to invoke the processes of the federal judiciary under § 6973 or § 6972(a)(1). It has also already been determined that a private citizen or person, such as the City of Gallatin, is able to enforce the requirement of § 6943(a)(2)–(3), by suing state or federal officials charged with enforcement of the prohibition for failure to discharge their duties. Here, however, neither officials of the Texas Department of Health nor of the E.P.A., the relevant state and federal enforcement agencies, have been named as parties defendant. Instead, plaintiff has sued the defendant Cherokee County, as owner and operator of the site, under the theory that § 6945(a) directly prohibited open dumping. This theory has been rejected.[6]

For all of the foregoing reasons, pursuant to Rule 12(b)(6), F.R.Civ.P., it is

ORDERED, *sua sponte*, pursuant to Rule 12(b)(6), F.R.Civ.P., that this civil action shall be, and it is hereby, DISMISSED, for failure to state a claim upon which relief can be granted.

---

6. Although it is dictum, it should also be observed that, even if E.P.A. approves the Texas plan in the very near future, it is difficult to imagine a suit against T.D.H. or E.P.A. officials becoming ripe for some time. A copy of the Texas plan has been submitted to the court (at its request). It purports to prohibit open dumping and to create a procedure for enforcing compliance with that prohibition. *See* "Solid Waste Management Plan for Texas, 1980–1986, Volume One, Municipal Solid Waste," pp. 89–92, 96–97. Until T.D.H. and E.P.A. have had an opportunity to supervise the operation of the plan, it appears that it would be impossible for them to have failed to discharge their duties.