**Taylor Wallace BLUE LEGS, Executor of the Estate of Mattie Blue Legs, deceased; and Margaret Jenkins, Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Lee M. Thomas, Administrator of the Environmental Protection Agency; United States Bureau of Indian Affairs; United States Indian Health Service; and the Oglala Sioux Tribe, Defendants.**

**Civ. No. 85–5097.**

United States District Court,
D. South Dakota, W.D.

Sept. 3, 1987.

Krista Clark, Dakota Plains Legal Services, Mission, S.D., for plaintiffs.

Marvin Amiotte, Pine Ridge, S.D., Ted L. McBride, Asst. U.S. Atty., Rapid City, S.D., Carl Strass, Environmental Defense Section, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

BATTEY, District Judge.

### INTRODUCTION

Plaintiffs Taylor Wallace Blue Legs, administrator of the estate of Mattie Blue Legs, and Margaret Jenkins, have sued the Environmental Protection Agency (EPA), its Administrator Lee Thomas, the Bureau of Indian Affairs (BIA), the Indian Health Service (IHS), and the Oglala Sioux Tribe (OST), alleging that all are in violation of the provisions of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.*, and the federal regulations applicable to it.

The Plaintiffs seek an injunction and declaratory relief requesting an order that all of the Defendants insure that the solid waste on the Pine Ridge Indian Reserva-

tion (Reservation) is disposed of in compliance with the Resource Conservation and Recovery Act (RCRA—the successor to the Solid Waste Disposal Act), 42 U.S.C. § 6901 *et seq.;* the Snyder Act, 25 U.S.C. § 13; the Indian Sanitation Facilities Act, 42 U.S.C. § 2004a; the Indian Health Care Improvement Act (IHCIA), 25 U.S.C. § 1601 et seq.; and the federal government's trust responsibility.

This case is presently before the Court on cross motions for summary judgment by all of the parties.

## STIPULATION OF FACTS

The parties have stipulated to the following facts:

1. Plaintiff, Mattie Blue Legs, now deceased, was a United States citizen of American Indian descent and an enrolled member of the Oglala Sioux Tribe.

2. Plaintiff, Margaret Jenkins, is a United States citizen of American Indian descent and an enrolled member of the Oglala Sioux Tribe.

3. Margaret Jenkins resides in Wanblee, South Dakota, approximately three miles from a solid waste disposal site that is located in Wanblee.

4. The present solid waste disposal facility at Wanblee is fenced and has a disposal pit. The facility at Wanblee was opened by the local tribal community. Wanblee, South Dakota, is within the exterior boundaries of the Pine Ridge Indian Reservation.

5. Solid waste disposal sites are also located in the towns of Kyle, South Dakota; Sharps Corner, South Dakota; Batesland, South Dakota; Porcupine, South Dakota; Manderson, South Dakota; Wounded Knee, South Dakota; Pine Ridge, South Dakota; and Oglala, South Dakota. Other solid waste disposal sites are located near the Evergreen and Wolf Creek housing sites on the Pine Ridge Indian Reservation and there is an old solid waste disposal site at Wanblee.

6. With the exception of the Batesland site, all of these solid waste disposal sites are located on lands of the Oglala Sioux Tribe and/or individual tribal members that are held in trust for the Tribe by the United States of America.

7. It is the position of BIA, IHS, and the Oglala Sioux Tribe (OST) that the Tribe, as the beneficial owner of lands held in trust by the United States, does not need a lease or permit from the BIA or IHS to use or occupy tribal trust lands for these purposes.

8. It is the position of the Plaintiffs that the Tribe cannot use its lands for these purposes without the consent of the BIA or IHS.

9. The Batesland site is fee land that is not held in trust by the United States of America.

10. Each of the solid waste disposal sites identified or referred to in paragraphs four through six and paragraph nine is located within the exterior boundaries of the Pine Ridge Indian Reservation.

11. Each of the solid waste disposal sites identified or referred to in paragraphs four through six and paragraph nine is operated in the manner of a "community open pit." None of these solid waste disposal sites is supervised. None, except the new Wanblee site, is fenced. Approximately half of the sites have a sanitary trench. Application of cover material is infrequent and irregular. All have scattered debris. Most of the sites are in the vicinity of or near one or more of the following: housing, schools, and streams or springs.

12. On or about December 14, 1976, the Oglala Sioux Tribal Council enacted a garbage and refuse disposal ordinance, Ordinance No. 76–14 which was denominated "[A]n ordinance for the regulation of garbage and refuse storage collection and disposal, for the promotion of health and control of disease." The ordinance pertains, among other things, to solid waste disposal and collection on the Pine Ridge Indian Reservation.

13. The Pine Ridge Village Garbage Service collects and disposes of solid waste generated by OST. The Pine Ridge Village is one of the communities of the Tribe.

14. Bureau of Indian Affairs (BIA) facilities on the Pine Ridge Indian Reservation consist of the Pine Ridge Agency, a few residences and/or school buildings.

15. BIA pays the Pine Ridge Village Garbage Service (PRVGS) to collect and dispose of solid waste generated by the Pine Ridge Agency on a month-to-month basis using a procurement contract or purchase orders for this service.

16. BIA maintenance personnel dispose of solid waste collected from the Crazy Horse Day School in Wanblee, the American Horse Day School, and government-owned quarters in Allen, South Dakota, and the Loneman Day School in Oglala by transporting the waste to the solid waste disposal facilities operated by the Tribe at Wanblee, Allen, and Oglala, respectively, and depositing it there.

17. The Indian Health Service (IHS) pays the Pine Ridge Village Garbage Service to collect solid wastes from IHS facilities at Pine Ridge, Wanblee, and Allen on a month-to-month basis using purchase orders. IHS facilities at Pine Ridge consist of the hospital, 47 homes, and the nurses' quarters. IHS facilities at Wanblee consist of the health center and seven housing units. IHS facilities at Allen consist of the health station. The PRVGS transports collected waste to the Pine Ridge and Wanblee dump sites (community open pits) for disposal.

18. IHS has an informal arrangement with the BIA contractors operating BIA contract schools in Porcupine and Loneman to collect solid waste from the IHS health stations in addition to the collections from the BIA schools and dispose of the solid waste at the Porcupine and Oglala dumps.

19. IHS health stations at Kyle and Manderson burn their solid wastes on site in open-topped 55-gallon drums.

20. IHS health facilities on the Reservation require IHS personnel to transport all infectious solid wastes to either the Pine Ridge Hospital or the Wanblee clinic for incineration.

21. OST has not entered into any contracts or agreements with the BIA or IHS or any other persons for the purpose of disposing of solid wastes generated by BIA or IHS on the Reservation.

22. BIA and IHS have not entered into any contracts or agreements with OST or each other for the purposes of disposing of solid wastes generated by BIA or IHS on the Reservation.

23. IHS does not authorize, license, or grant permits for the operation and maintenance of solid waste facilities on the Reservation.

24. Generally, IHS provides technical assistance to OST to assist the Tribe with its solid waste operation and maintenance responsibilities. Specifically, IHS provides technical assistance through IHS–employed engineers and sanitarians to Tribal Utility Organizations concerned with water, sewer, and solid wastes. The technical assistance is information and research by the engineers and sanitarians of the Environmental Health Program of IHS.

25. IHS has expended funds, under its authority in Pub.L. No. 86–121, 42 U.S.C. § 2004a, to obtain solid waste equipment for tribal use, to assist the Tribe in the development of solid waste ordinances for tribal adoption, to assist the Tribe in the development of solid waste plans for tribal implementation, and to assist the Tribe in the closing of dumps in response to requests for assistance from the Tribe or the submission of proposals by the Tribe.

26. IHS does not supervise or assist in the operation and maintenance of the solid waste disposal facilities located on the Reservation, but assists the Tribe by taking the actions described in paragraph 25.

27. The Bureau of Indian Affairs, Pine Ridge Agency, has neither issued nor approved any leases or permits for dumpsites, sanitary landfills, or other "solid waste disposal facilities" on the Pine Ridge Indian Reservation during the period at issue in this litigation.

28. BIA does not supervise the Tribe's operation of solid waste disposal on the Reservation, but upon request from the Tribe, BIA provides technical assistance by providing general answers to technical

questions pertaining to site location and suitability or technical information in response to a specific inquiry and the short term loan of equipment as requested by OST.

29. BIA does not operate, supervise, or otherwise control operation of any of the "solid waste disposal facilities," "dump-sites," or "sanitary landfills" on the Pine Ridge Indian Reservation, but assists the Tribe by taking the actions described in paragraph 28.

30. The Environmental Protection Agency (EPA) does not authorize, license, or grant permits for the operation and maintenance of solid waste facilities on the Reservation.

31. EPA does not operate, supervise, or otherwise control operation or maintenance of any of the solid waste disposal facilities located on the Reservation.

## ISSUES

One can see from these stipulated facts that there is no dispute that these dump sites are being maintained improperly. Each of the solid waste disposal sites is operated in the manner of a "community open pit" or "open dump."[1] None, except the new Wanblee site, are fenced. Approximately half of the sites have a sanitary trench. Application of cover material is infrequent and irregular. All have scattered debris. Most of the sites are in the vicinity of or near one or more of the following: housing, schools, and streams or springs. These sites are in an unsightly and unhealthy condition. The disputed issues in this case concern not so much who has caused these conditions, but who is responsible for changing them. Once having determined responsibility, the next question is whether the Plaintiffs have a remedy in this Court and if so, what might that be.

## HISTORY AND PURPOSE OF THE SOLID WASTE DISPOSAL ACT

The Solid Waste Disposal Act, 42 U.S.C. §§ 3251–3259, was the first federal legislation dealing with solid waste management. The Resource Conservation and Recovery Act (RCRA) was enacted in 1976 as an amendment to the Solid Waste Disposal Act. The Act contains separate titles: TITLE I, GENERAL PROVISIONS; TITLE II, OFFICE OF DISCARDED MATERIALS; AUTHORITIES OF THE ADMINISTRATOR; TITLE III, HAZARDOUS WASTE MANAGEMENT; TITLE IV, STATE OR REGIONAL DISCARDED MATERIALS PLANS; TITLE V, DUTIES OF THE SECRETARY OF COMMERCE IN RESOURCE AND RECOVERY; TITLE VI, FEDERAL RESPONSIBILITY; TITLE VII, MISCELLANEOUS PROVISIONS; AND TITLE VIII, RESEARCH, DEVELOPMENT, DEMONSTRATION, AND INFORMATION.

The legislation regarding the disposal of solid wastes was originally found at Pub.L. No. 89–272, Title II, Oct. 20, 1965, 79 Stat. 997, and codified at 42 U.S.C. Chapter 39 (§§ 3251–3259), known as the Solid Waste Disposal Act. In 1976 the chapter was amended, reorganized, and expanded by section 2 of Pub.L. No. 94–580, Oct. 21, 1976, 90 Stat. 2795, which is now found at 42 U.S.C. Chapter 82 (§§ 6901 et seq.). In 1984 amendments were added by Pub.L. No. 98–616, further extending the Act.

Congressional findings recognized with respect to solid waste were: (1) there have been ever-changing characteristics of the mass of material being discarded; (2) economic and population growth with its increase in the standard of living have required new construction, highways, and other transportation avenues resulting in a rising tide of scrap, discarded and waste

---

1. Congress has referred to an open dump as a land disposal site where discarded materials are deposited with little or no regard for pollution controls or aesthetics, where the wastes are left uncovered, and where frequently the use of the site for waste disposal is neither authorized nor supervised. The adverse impact of open dumping includes fire hazards, air pollution (including reduced visibility), explosive gas migration, surface ground water contamination, disease transfer (via vectors such as rats and flies, personal injury (to unauthorized scavengers), and aesthetic blight.) H.R. No. 94-1491 Part I (Pub.L. No. 94–580) 1976 U.S.Code & Admin. News 6238, 6275.

materials; (3) population concentrations have presented the communities with financial, management, intergovernmental and technical problems; (4) while the collection and disposal of solid wastes should continue to be primarily the function of state, regional, and local agencies, the problems of waste disposal have become a matter national in scope. 42 U.S.C. § 6901.

With respect to the environment and health, Congress was also concerned that (1) land is too valuable a national resource to be polluted by solid waste, most of which is disposed of on land in open dumps and sanitary landfills; (2) disposal of solid waste (and hazardous waste) without careful planning and management can present a danger to human health and environment; (3) as a result of the Clean Air Act (42 U.S.C. § 7401 *et seq.*) and other acts affecting health and environment, greater amounts of solid waste have been created. Similarly, unsound disposal practices have created an increased amount of air and water pollution along with other environmental health problems; (4) open dumping is particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and land; (5) a greater degree of regulation is required in hazardous as opposed to nonhazardous solid waste. 42 U.S.C. § 6901.

RCRA was a multi-faceted approach toward solving the problems associated with the 3–4 billion tons of discarded materials generated each year, and the problems resulting from the anticipated 8 percent annual increase in the volume of such waste. H.R. No. 94–1491—Part I (Pub.L. No. 94–580) 1976, U.S.Code Cong. & Admin.News 6239. Congress recognized that the words "discarded materials" [2] more accurately reflect its concerns because not only solid wastes, but also liquid and contained gaseous wastes, semi-solid wastes, and sludges were the subject of this legislation. *Id.* at 6240. The Congress was also concerned with the nation's consumption of domestic

raw materials which could potentially result in future shortages. A third major concern was the health and safety of the population and the environment when exposed to toxic, lethal, or hazardous wastes. Unless hazardous wastes were properly managed in their disposal, they would present a clear danger to the health and safety of the population and to the quality of the environment. *Id.* at 6241.

Congressional encouragement of planning for future disposal of discarded materials under Title IV above may be contrasted with Congress's treatment of hazardous wastes under Title III of RCRA. With regard to hazardous wastes, Congress saw fit to adopt a regulatory approach. *Id.* at 6241–42. RCRA authorizes the EPA to undertake: (1) direct regulation of the generation, transportation, treatment, storage, and disposal of those solid wastes which qualify as hazardous wastes.[3] Therefore, whenever hazardous wastes are generated, the EPA has the unquestioned authority to implement a disposal program complying with the minimum federal standards. In comparison, RCRA's provision for nonhazardous discarded materials only authorizes "technical and financial assistance to state governments for the development of solid waste management plans." [4] Specific statutory treatment of discarded materials will be further discussed later in this opinion.

### a. hazardous waste

Hazardous wastes are economically valueless, not susceptible of neutralization, present serious danger to human life and environment and can only be safely stored, treated, or disposed of at considerable cost. Because of the added costs of properly disposing of hazardous wastes, many competitive businesses would not voluntarily comply with suggested guidelines for the disposal of hazardous materials. Congress therefore adopted a regulatory framework, without which hazardous waste would continue to be disposed of in ponds, lagoons, or

---

2. Discarded materials is the term used to identify collectively those substances often referred to as industrial, municipal, or post-consumer waste, refuse, trash, garbage, and sludge. *Id.* at 6240.

3. Subchapter III—Hazardous Waste Management, 42 U.S.C. §§ 6921–6934.

4. Subchapter IV—State or Regional Solid Waste.

on the ground, resulting in substantial and sometimes irreversible pollution of the environment. *Id.* at 6241. Congress thus attempted to close its last remaining loophole in environmental law. In doing so, the regulatory, technical assistance, and planning functions were placed in the Environmental Protection Agency (EPA).

Enforcement of the terms of the Hazardous Waste Act is to be accomplished by federal and state inspections, compliance orders issued by the Administrator of the EPA and enforced in court with accompanying civil and criminal penalties. Congress intended that the Administrator, upon finding a violation of the provisions of the law, would be required to issue a notice to the violator which contained with reasonable specificity the nature of the violation, the time for compliance and the penalty for noncompliance. If the violation is not corrected within 30 days, then the Administrator can issue a compliance order or commence an action in district court.

### b. discarded materials

Congress looked at the problems of the increasing amount of discarded materials and determined that some of these discarded materials could be recycled to recover some of the valuable energy or raw materials initially used to manufacture them. This would benefit the environment by reducing the volume of refuse and thereby protecting scarce land supply. *Id.* Additionally, the nation's importation of foreign energy and raw materials could be reduced by the substituting of recycled raw materials for virgin raw materials where appropriate. Useful employment could also be generated by the construction of needed waste management or recycling facilities. All these objectives could best be achieved through the implementation of discarded material planning.

With regard to discarded materials plans, Congress stated that the principal waste management tool currently used today is land disposal (despite the potential for envi-ronmental degradation from leachate). Congress recognized that the most effective approach for alleviating the problems created by discarded materials is a comprehensive discarded materials management approach by providing for studies, demonstrations, and dissemination of information on resource recovery, disposal, and resource conservation techniques. *Id.* at 6270. In order to encourage planning and coordination between local, regional, state, and interstate areas, this legislation offered technical and financial assistance to such units of government for discarded materials planning. *Id.* at 6271. Federal and technical aid was designed to be an incentive to such units of government to cooperate in the development of the proper areas and appropriate units of government to undertake the responsibility for development and implementation of the plan.

Simply stated, the discarded materials problem was looked upon as one of planning. Federal guidelines were to foster cooperation between the federal, state, and local governments and to meet the "very broad and flexible objectives of this act." The Committee report specifically stated:

> If those objectives are not met, the states and local authorities within the states will lose the federal or technical assistance. However, the provisions of this legislation specifically do not authorize the federal government to take over the responsibility for discarded materials disposal planning.

*Id.* at 6271.

## RESOURCE CONSERVATION AND RECOVERY ACT (RCRA)

Pub.L. No. 94–580, 90 Stat. 2795, 42 U.S.C. §§ 6901–6987, known as the Resource Conservation and Recovery Act of 1976, was the first comprehensive federal legislation for waste management. The citizens suit provision of RCRA is found at 42 U.S.C. § 6972.[5] The Act contains a general

---

**5.** § 6972. Citizens suits
  (a) In general
    Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

(1)(A) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of

prohibition against open dumping of solid waste.[6] After the passage of the Act it became subject to differing court interpretation. In *City of Gallatin v. Cherokee County*, 563 F.Supp. 940 (E.D.Tex.1983), Chief Judge Justice held that section 6945 did not directly prohibit open dumping. Accordingly, he held that a state was not required to prohibit open dumping unless it has sought federal funds and its plan for solid waste disposal had been approved by the EPA and even so, no citizens suit would lie against the owner or operator of an open dump.

In *O'Leary v. Moyer's Landfill, Inc.*, 523 F.Supp. 642 (E.D.Pa.1981), Judge Pollak reached a contrary result and in support of his decision citing the view of the EPA in regulation 44 Fed.Reg. 45066, 45072 (1979) which stated in part as follows:

> The open dumping prohibition is a provision of federal law which stands on its own, separate from the State planning programs. In conjunction with the citizens suit provision, the open dumping prohibition creates a Federal cause of action allowing citizens and States to seek relief in Federal court for damaging solid waste management practices.

*O'Leary* was followed in *Jones v. Inmont Corp.*, 584 F.Supp. 1425 (1984), where Judge Spiegel held that section 6945 was not merely an enabling provision al-

---

any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or

(B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment; or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator. Any action under paragraph (a)(1) of this subsection shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur. Any action brought under paragraph (a)(2) of this subsection may be brought in the district court of the district in which the alleged violation occurred or in the District Court of the District of Columbia. The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A), to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (a)(B), to order such person to take such other action as may be necessary, or both, or to order the Administrator to perform the act or duty referred to in paragraph (2), as the case may be, and to apply any appropriate civil penalties under section 6928(a) and (g) of this title.

6. § 6945. Upgrading of open dumps

(a) Closing or upgrading of existing open dumps

Upon promulgation of criteria under section 6907(a)(3) of this title, any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section. For purposes of complying with section 6943(a)(2) and 6943(a)(3) of this title, each State plan shall contain a requirement that all existing disposal facilities or sites for solid waste in such State which are open dumps listed in the inventory under subsection (b) of this section shall comply with such measures as may be promulgated by the Administrator to eliminate health hazards and minimize potential health hazards. Each such plan shall establish, for any entity which demonstrates that it has considered other public or private alternatives for solid waste management to comply with the prohibition on open dumping and is unable to utilize such alternatives to so comply, a timetable or schedule for compliance for such practice or disposal of solid waste which specifies a schedule of remedial measures, including an enforceable sequence of actions or operations, leading to compliance with the prohibition on open dumping of solid waste within a reasonable time (not to exceed 5 years from the date of publication of criteria under section 6907(a)(3) of this title).

(b) Inventory

To assist the States in complying with section 6943(a)(3) of this title, not later than one year after promulgation of regulations under section 6944 of this title, the Administrator, with the cooperation of the Bureau of the Census shall publish an inventory of all disposal facilities or sites in the United States which are open dumps within the meaning of this chapter.

lowing the promulgation of regulations but also contained a prohibition against open dumping when it stated, "Upon promulgation of criteria under section 6907(a)(3) of this title, any solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited...."

Later that year Congress expressly overruled the holding in *City of Gallatin.* The legislative history to Pub.L. No. 98–616 stated:

> This opinion [City of Gallatin] misinterprets Section 4005(a) [42 U.S.C. § 6945]. In enacting this provision, it was Congress's intent that the open dumping prohibition go into effect upon promulgation of EPA regulations under section 1008(a)(3) [42 U.S.C. § 6907] defining open dumping, and that the prohibition be defined on the basis of these regulations. It was also Congress's intent that persons seeking to enforce the opening dumping prohibition bring suit—not against the Federal government or the state—but against persons engaged in the act of open dumping and that the Federal District Courts be authorized to enjoin such persons directly although the Committee believes that Congress's intent is clear on the face of the statute. In light of the *City of Gallatin* decision the Committee is amending Section 4005(a) (and 7002(a)(1)) to further emphasize and clarify its original intent. 1984 U.S.Code Cong. & Admin.News 5576, 5612–13.

The 1984 amendment to the Act provided an extension into the enforcement area by providing specifically for the prohibition of open dumping. The amendment added the provision, "The prohibition contained in the preceding sentence shall be enforceable under section 6972 of this title against persons engaged in the act of open dumping." 42 U.S.C. § 6945.

The 1984 amendment added a new paragraph to section 6972. Subsection (a)(1)(B) was added by Pub.L. No. 98–616, § 401(a)(3) which is set forth under footnote 5 of this opinion.

The sum total of these decisions and the legislative changes is that Congress intended to provide a broad plan for the resolution of the nation's problems with hazardous and non-hazardous waste.

## OGLALA SIOUX TRIBE

■ The Court finds that it has jurisdiction to enforce the provisions of the RCRA concerning the prohibition of open dumps against the Oglala Sioux Tribe. OST has the responsibility to regulate, operate, and maintain the dumps on the Reservation. This responsibility stems from the inherent sovereignty which Indian tribes possess.

■ Under the statute the term "person" [7] is defined as including a "municipality." "Municipality" [8] is defined by statute to mean "an Indian tribe or authorized tribal organization." These definitions, along with the provisions for citizens suits, indicate Congressional intent to subject tribes to suit under section 6972.

Had Congress not explicitly intended RCRA to apply to the Indian communities, this Court would find that it impliedly intended its application. Such interpretation would be entirely consistent with the concept of Indian sovereignty. Indian people are no less subject to the hazards addressed by RCRA than other people. Surely they are entitled to the same Congressional concern over the health of the citizens as anyone else. In that portion of House Report 94–1491, 94th Congress 2d Session 1976, concerning open dumps, the report said that a study of solid waste management practices on Indian reserva-

---

7. 42 U.S.C. § 6903(15) reads: "The term 'person' means an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body."

8. 42 U.S.C. § 6903(13 A) reads: "The term 'municipality' (A) means a city, town, borough, county, parish, district, or other public body created by or pursuant to State law, with responsibility for the planning or administration of solid waste management, or an Indian tribe or authorized tribal organization or Alaska native village or organization...."

tions in 1970 found open dumping common. Further, U.S. Public Health physicians reported treating large numbers of cuts and punctures received by Indian children playing in the dumps. 1976 U.S.Code Cong. & Admin.News 6238, 6275.

A recent Ninth Circuit case addressed the issue of jurisdiction over Indians under the RCRA. In *State of Washington, Dept. of Ecology v. United States Environmental Protection Agency*, 752 F.2d 1465 (9th Cir.1985), the issue was state versus federal jurisdiction under the RCRA statutes. RCRA permits states to develop and implement state hazardous waste programs in lieu of the federal program. The state of Washington applied for a state plan, including plans for Indian land in the state. EPA refused the permit for the Indian land, but approved the permit for the rest of the state. The issue in the court of appeals was whether EPA violated the requirements of RCRA when it refused to permit Washington to apply its state hazardous waste regulations to the activities of all persons on Indian lands.

EPA studied the plan and concluded that the state had not adequately demonstrated its authority to exercise jurisdiction. The court agreed, noting that the RCRA requirements apply to all persons, including Indian tribes, but that RCRA statutes do not directly address how hazardous waste management programs should be implemented on reservations. *Id.* at 1466, 1469. Noting that the only mention of Indians is in section 6903(13), the court stated:

> [T]he reference indicates only that the tribes are regulated entities under the RCRA, since "municipality" is included within the statutory definition of "person" [citation omitted] and the enforcement provision of these statutes apply to "any person" [citation omitted].

*Id.* at 1469.

The *Washington* case established, and this Court agrees, that Indian tribes are regulated entities under RCRA. If the tribes are regulated entities, then they should be subject to citizens suits if a plaintiff makes allegations which fall within one of the categories of section 6972(a)(1)(A) or (B).

The OST itself has acknowledged its tribal sovereignty over tribal lands, as well as its responsibility to regulate, operate, and maintain the dumps on the reservation.

It is not disputed that the OST "enacted a garbage and refuse disposal ordinance which is designed to regulate the storage, collection, and disposal of garbage and refuse for the promotion of health and control of disease." (S. 12). The OST participates in open dumping and enters into contracts which involves it in the management of the dumps. (S. 13).

Although the OST and the federal defendants advance the theory of sovereign immunity, each does so in different context. OST would have this Court apply the doctrine so as to bar this action and require resolution of the matter by the OST tribal court. The federal defendants apply the doctrine so as to convince the Court that the responsibility for compliance with RCRA is with the Tribe and not with them.

This Court holds that RCRA is a preemption upon the sovereignty of the OST. While no useful purpose would be served by a recitation of the judicial history, it is important to point out that the Indian tribes still possess their inherent sovereignty, except where it has been specifically taken from them either by treaty or by Congressional act. *Iron Crow v. Oglala Sioux Tribe of Pine Ridge*, 231 F.2d 89 (8th Cir.1956). *See also Indian Rights and the Federal Courts*, 24 Minn.L. Rev. 145, 147 (1940) by Felix Cohen, where the author stated, "With inherent sovereignty, at least in certain areas, tribal actions are lawful unless their validity is limited by the United States Constitution or federal statutes."

Under the facts of this case, the dump sites are not under lease. They are operated subject to the control of the Tribe. Pursuant to the duty to manage the open dumps, the Tribe has enacted a garbage and refuse disposal ordinance. The ordinance is entitled, "An Ordinance for the Regulation of Garbage and Refuse Storage

Collection and Disposal for the Promotion of Health and Control of Disease."

Further, the OST authorized the issuance of permits for dumping from an adjunct association known as the Pine Ridge Sanitation Maintenance Service. The purpose of this association is "to carry on the business of operating and maintaining ... all Sanitary Facilities built or maintained by or for the Oglala Sioux Tribe or its members within the boundaries of the Pine Ridge Indian Reservation." Article II, Articles of Association and Bylaws of Pine Ridge Sanitation and Maintenance Service.

It is clear from the provisions of the Oglala Sioux Tribe Garbage and Refuse Disposal Ordinance that the governing body of the OST has both the responsibility for the collection and disposal of solid wastes on the Reservation and the responsibility under its own law for maintaining the solid waste disposal sites on the Reservation.

Accordingly, this Court finds that the OST is subject to the application of RCRA.

**EPA RESPONSIBILITY**

■ Under RCRA, the EPA does not have the Congressionally granted authority over open dumping under Title IV relating to discarded materials that it has under Title III relating to hazardous waste. Indeed, absent specifically enumerated powers, any enforcement encroachment into open dumping on the Pine Ridge Indian Reservation would be a violation of the inherent sovereignty of the Oglala Sioux Tribe. The solution to open dumping on the Reservation is best left to the Indian people themselves through enforcement of tribal ordinances enacted by the duly elected tribal council. The council itself must recognize and then deal with this hazard to the health and welfare of the Indian people and the destruction to the environment in which its people live. The unsightly and unhealthy conditions will diminish in direct proportion to the amount of pride in their

communities which the council and the tribal members maintain.

EPA, however, has some responsibility in solving the problem. Specifically, RCRA required EPA to issue certain guidelines and criteria for solid waste management to assist states and local governments and regions in their solid waste planning. EPA has promulgated those regulations and guidelines at 40 C.F.R. § 257. RCRA further authorizes EPA to provide technical and financial assistance in order to implement solid waste management regulations on the Reservation.

The regulations set forth that the Indians are treated the same as any other municipality. It reads as follows:

> Major Federal facilities and Native American Reservations should be treated for the purpose of these guidelines as though they are incorporated municipalities, and the facility director or administrator should be considered the same as a locally elected official.

40 C.F.R. § 255.33.

The guidelines referred to are those in 40 C.F.R. § 255 for the identification of regions and agencies for solid waste management. The "administrator" referred to means the administrator of the federal facility or reservation, such as a tribal council chairman or a designated representative.[9]

**BUREAU OF INDIAN AFFAIRS AND INDIAN HEALTH SERVICE**

It is the Plaintiffs' position that the federal defendants Bureau of Indian Affairs (BIA) and Indian Health Service (IHS) are in violation of the provisions of RCRA, specifically 42 U.S.C. §§ 6964(a)(1)(A) and 6964(a)(3), because they have "jurisdiction over the PRIR and allow land held in trust by the United States to be used as open dumps...."

The Plaintiffs concede, however, that they point to no specific statutory authorization except 42 U.S.C. §§ 6964(a)(1)(A)[10]

---

**9.** When the term Administrator is used in the regulations to indicate the Administrator of EPA, the term is always capitalized. *See, e.g.,* 40 C.F.R. §§ 260.20–260.22.

**10.** § 6964. Applicability of solid waste disposal guidelines to Executive agencies.

and 6964(a)(3) [11]. The Court has not been favored with any case authority on point, nor can the Court find such authority. The legislative history is at best not helpful as shown by the prior discussion herein.

■ Hardly can a court construe RCRA to contain a broad jurisdictional grant of power to the BIA and IHS to administer open dumping on the Reservation. Such a construction would fly in the face of the authorities and discussion pertaining to tribal sovereignty and otherwise would be a legislative construction not called for by the four corners of the Act.

Plaintiffs rely upon *McNabb v. Heckler*, 628 F.Supp. 544, 547–549 (D.Mont.1986) and *White v. Califano*, 437 F.Supp. 543 (D.S.D.1977), *aff'd* 581 F.2d 697 (8th Cir. 1978) to support the argument requesting this Court to extend the jurisdiction of the IHS and BIA to manage dumps on the Reservation. By analogy to *McNabb* and *White*, the Plaintiffs would extend the well-recognized trust responsibility of the federal government to the Indian tribes to that of "do[ing] more than it does now to see that the dumpsites on the PRIR conform to the provisions of RCRA...." The problem with adopting the reasoning of *White* and *McNabb* is that RCRA contains no specific authorization to do what the Plaintiffs would have the court do.

In *White*, the law was clear that the trust responsibility of the federal government in relation to Indian tribes in the area of health services was explicitly mandated by the Indian Health Care Improvement Act (IHCIA) and the law then in existence. There the district court quite properly held that the Indian Health Service had a responsibility to care for a mentally ill member of an Indian tribe.

In *McNabb*, the issue was whether the federal government had the burden to pay for the medical expenses accrued by an Indian child as opposed to the claim that the obligation for payment rested with Roosevelt County, Montana, the county of the residence of the child, and therefore, the responsible county under Title 53, Chapter 3, Montana Code Annotated. *McNabb* followed *White* on the basis that a clear duty existed under the Snyder Act, 25 U.S.C. § 13 and the Indian Health Care Improvement Act, 25 U.S.C. § 1601 *et seq.*

*White* and *McNabb* therefore furnish no authority for the Plaintiffs' position. The primary duty for the enforcement of RCRA is with the Tribe. This is not to say that the BIA and IHS do not have a role in providing assistance to the OST. The federal defendants must stand ready to assume their statutorily mandated duty with respect to the Indian communities of the Pine Ridge Indian Reservation.

The Indian Health Care Improvement Act (IHCIA) is an act intended to mandate the federal government's commitment to improve Indian health care. 25 U.S.C. § 1602. It authorizes appropriations for the construction of safe sanitary disposal facilities. *Id.*, sections 1632 and 1634.

■ Plaintiffs also contend that both the BIA and IHS have a duty to administer solid waste management activities under the RCRA provision regarding "federal responsibility." 42 U.S.C. § 6964 provides:

(1) If (A) an executive agency (now as defined in Section 105 of Title 5) or any unit of the legislative branch of the Federal Government has jurisdiction over any real property or facility, the operation or administration of which involves such agency in solid waste management activities ... then such agency shall ensure compliance with the guidelines recommended under Section 6907 of this title and the purposes of this chapter in

---

(a) Compliance
(1) If—
(A) an Executive agency (as defined in section 105 of Title 5) or any unit of the legislative branch of the Federal Government has jurisdiction over any real property or facility the operation or administration of which involves such agency in solid waste management activities....

**11.** § 6964. Applicability of solid waste disposal guidelines to Executive agencies.
(a) Compliance
(3) Each Executive agency which permits the use of Federal property for purposes of disposal of solid waste shall insure compliance with such guidelines and the purposes of this chapter in the disposal of such waste.

the operation or administration of such property or facility.

This Court believes that a plain reading of the statute is broad enough to bring the BIA and the IHS under its umbrella. The fact that the BIA and IHS utilize some of the sites for the purpose of dumping is relevant upon the Congressional intent that open dumping is to be prohibited by executive agencies under the statute. Thus the Court finds that the BIA and IHS are required to comply with RCRA § 6964.

Although the BIA and IHS are found by this Court to not have broad jurisdictional authority over the Reservation, this Court does find that they may not continue to contribute toward open dumping on the Reservation.

The facts show that the BIA facilities on the Reservation consist of the Pine Ridge Agency, a few residences and/or school buildings; that it participates by paying the Pine Ridge Garbage Service to collect and dispose of solid waste (which is, of course, deposited in the open dumps); that its maintenance personnel dispose of solid waste collected from the Crazy Horse Day School and government quarters in Allen, and the Loneman Day School in Oglala by transporting the waste to the solid waste disposal facilities operated by the Tribe at Wanblee, Allen, and Oglala.

With respect to the IHS, the facts show that the IHS pays the Pine Ridge Garbage Service to collect solid waste from IHS facilities at Pine Ridge, Wanblee, and Allen on a month-to-month basis; that the IHS facilities consist of a hospital, 47 homes and nurses' quarters and a health station at Allen; that the waste is transported to the Pine Ridge and Wanblee dump sites; that the BIA contractors collect waste from schools in Porcupine and Loneman which is deposited at the Porcupine and Oglala dump sites; IHS health stations at Kyle and Manderson burn their solid waste on site in open-topped 55–gallon drums and IHS health facilities require its personnel to incinerate infectious solid waste at the Pine Ridge Hospital or the Wanblee clinic.

■ Thus, the contribution·by the BIA and the IHS to the problem of open dump-ing on the Reservation can hardly be said to be *de minimus.* Accordingly, while the Court finds that RCRA does not provide authority to *manage* open dumping, nevertheless, the BIA and IHS are in violation of the provisions of section 6964 and thus are subject to citizens suits under section 6972(a)(1)(B).

## CONCLUSION

The EPA has performed all duties required of it pursuant to the statutes and regulations. No standards exist by which this Court can define additional nondiscretionary acts which must be performed by the EPA. Accordingly, Defendant EPA's motion for summary judgment is granted in favor of the Administrator and the Agency.

This Court finds that the Defendants BIA and IHS are in violation of RCRA as it applies to the prohibition of open dumping on the Pine Ridge Indian Reservation. Summary judgment against the BIA and IHS is granted.

■ With respect to the Oglala Sioux Tribe, it is held that it is responsible under RCRA for seeing that open dumps do not exist on tribal lands. The OST has received federal funds in the past through the IHS and BIA as financial assistance for the maintenance and operation of these dump sites. The OST has control over the disposal of solid wastes on the Reservation, both under federal law and under the tribe's own law, and the tribe has a duty to its people to see that these laws are complied with. The Court finds that the OST has a federal statutory responsibility to bring the dump sites into compliance with RCRA and the pertinent regulations. Summary judgment against the OST is granted.

The Court requires the OST, BIA, and IHS to submit a plan to the Administrator of the EPA and this Court within 120 days setting forth a plan including the steps to be taken to bring the dump sites into compliance. Upon the approval and implementation of such plan, the Administrator shall issue an order of compliance. This Court withholds the issuance of any injunctive

relief subject to the receipt of the plan within 120 days. Any orders issued by the Administrator for the protection of the public health and environment of the Pine Ridge Indian Reservation shall be subject to enforcement by this Court under the provisions of 42 U.S.C. § 6973 providing for a fine of not more than $5,000 for each day in which such violation occurs, or such failure to comply continues.

The Court shall maintain jurisdiction of the case for the purpose of receiving the 120 day plan of OST to comply with the federal regulations of RCRA.

**ORDER**

For the reasons given in the opinion, it is now

ORDERED that the Oglala Sioux Tribe, Bureau of Indian Affairs, and the Indian Health Service shall file with the Clerk of this Court and with the Administrator of the EPA on or before 120 days from this date, a plan by which it is proposed to change or modify the conditions of the open dump sites on the Reservation to bring them into compliance with RCRA and such measures promulgated by the Administrator of the EPA at 40 C.F.R. § 257 for the purpose of eliminating current health and environmental hazards and minimizing future potential hazards on the Pine Ridge Indian Reservation. Upon such approval of the plan by the EPA, or in the event of a failure to approve the plan by the EPA, the Administrator shall issue such orders as may be necessary to bring such sites into compliance.

IT IS FURTHER ORDERED that the Court shall retain jurisdiction of this case and all parties pending receipt and implementation of the plan to be submitted.