867 F.2d 1094
 29 ERC 1710, 19 Envtl. L. Rep. 20,717
 Taylor Wallace BLUE LEGS, Executor of the Estate of Mattie
Blue Legs, deceased; and Margaret Jenkins, Appellees,
v.
UNITED STATES BUREAU OF INDIAN AFFAIRS, United States Indian
Health Service and Oglala Sioux Tribe, Appellant.
 Nos. 87-5433, 87-5434.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 13, 1988.
Decided Feb. 9, 1989.
Rehearing and Rehearing En Banc Denied May 12, 1989.
 
 Marvin Amiotte, Pine Ridge, S.D., Jacques B. Gelin, Washington, D.C., for appellant.
 Krista H. Clark, Mission, S.D., for appellees.
 Before HEANEY* and MAGILL, Circuit Judges, and EDWARDS,** Senior Circuit Judge.
 HEANEY, Circuit Judge.
 
 
 1
 Taylor Wallace Blue Legs and Margaret Jenkins are members of the Oglala Sioux Tribe (Tribe) of Indians and reside on the Pine Ridge Indian Reservation (Reservation). They brought suit against the Environmental Protection Agency (EPA), the EPA's Administrator, the Bureau of Indian Affairs (BIA), the Indian Health Service (IHS) and subsequently joined the Tribe, complaining that garbage dumps located on the Reservation were maintained in violation of federal law. The United States District Court for the District of South Dakota dismissed the EPA and its Administrator. It ordered the Tribe, the BIA and IHS to submit a plan within 120 days to bring the dump sites into compliance. 668 F.Supp. 1329 (D.S.D.1987) (stayed pending our review).
 
 
 2
 On appeal, the Tribe argues that it is immune from suit, that resort must first be made to tribal courts, and that in any event, BIA and IHS are solely responsible for compliance. BIA and IHS argue that they have no legal duty to clean up the dumps; rather, the Tribe is responsible. We affirm the district court and hold that the Tribe, BIA and IHS share the responsibility of bringing the garbage dumps into compliance.
 
 BACKGROUND
 
 3
 The district court's order covered fourteen dump sites located on the Reservation. "Most of the sites are in the vicinity of or near one or more of the following: houses, schools, and streams or springs." 668 F.Supp. at 1333. The court found that twelve sites are unfenced. Six sites lack sanitary trenches. No site has a dirt covering. No site is supervised. All locations have had fires at the sites. 668 F.Supp. at 1331-32. Laboratory analysis of water samples from the sites showed "significant contamination," including organisms capable of "caus[ing] disease in wildlife and frequently in humans * * * urinary tract infections and infections of the respiratory system * * * neonatal infections, involving the central nervous system and other organs." Plaintiff's Exhibit No. 63. Children, pets and others can easily come in contact with the sites given the present condition of the dumps. Moreover, the sites represent a danger even to those who do not wander near them.
 
 
 4
 In conditions of high rainfall and/or flooding, as undoubtedly occurs in your geographical-climatic area, spread of all these potentially pathogenic bacteria would occur readily. Surface wells and insufficiently protected drinking water would be contaminated quite easily. Also, the flies and other disease vectus from the dump sites can spread these organisms to food and other entry sites to humans.
 
 
 5
 Id.
 
 
 6
 An outbreak of disease threatens people living off the Reservation as well.
 
 
 7
 BIA and IHS operate schools, a hospital, a health station, and own over 47 homes and other residences on the Reservation. BIA and IHS dispose of their trash through the Pine Ridge Village Garbage Service (Service), an adjunct of the Tribe. At some locations BIA personnel transport the waste directly to disposal facilities; at other locations the Service collects the waste. Immediately, infectious waste is incinerated at the IHS health stations. IHS provides technical assistance to the Tribe in the form of information and research about solid waste disposal, and has in the past provided some money to help purchase relevant equipment. Neither agency supervises the Tribe's waste disposal but both are aware of the conditions on the Reservation and continue to contract with the Service for disposal in violation of law. 668 F.Supp. at 1331-33.
 
 
 8
 There is little disagreement between the parties about these facts. This dispute concerns who is to pay for the initial clean-up and subsequent maintenance.
 
 I. THE TRIBE
 
 9
 The Tribe argues that it is immune from this suit, that the plaintiffs must exhaust tribal remedies before proceeding in federal court and that the federal defendants are solely responsible for cleaning up the sites. The district court rejected the Tribe's first two contentions, as do we.
 
 A. Sovereign Immunity
 
 10
 Over the course of the last two centuries Indian tribes have evolved into dependent associations with limited powers of self-government. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55-57, 98 S.Ct. 1670, 1675-76, 56 L.Ed.2d 106 (1978). Where Congress clearly indicates that Indian tribes are subject to a given law, no tribal sovereignty exists to bar the reach or enforcement of that law. Id. at 58-59, 98 S.Ct. at 1677; United States v. United States Fidelity and Guar. Co., 309 U.S. 506, 512-13, 60 S.Ct. 653, 656-57, 84 L.Ed. 894 (1940); Iron Crow v. Oglala Sioux Tribe, 231 F.2d 89, 94 (8th Cir.1956). We turn to the question of whether Congress has abrogated the tribe's immunity in this matter.
 
 
 11
 Congress passed the Resource Conservation and Recovery Act of 1976 (RCRA) to remedy national problems caused by hazardous waste and solid waste disposal. Pub.L. No. 94-580, 90 Stat. 2795, codified at 42 U.S.C. Secs. 6901 et seq., amending the Solid Waste Disposal Act, 42 U.S.C. Secs. 3251-59. Congress was concerned that a failure to address all sources of pollution would render efforts aimed at other sources ineffectual.[1]
 
 
 12
 Congress also decided to regulate the disposal of discarded materials on reservations. Under the RCRA, citizens are permitted to bring compliance suits "against any person (including (a) the United States, and (b) any other governmental instrumentality or agency * * * ) who is alleged to be in violation * * *." 42 U.S.C. Sec. 6972(a)(1)(A).[2] "Person" is subsequently defined to include municipalities. 42 U.S.C. Sec. 6903(15). Municipalities include "an Indian tribe or authorized tribal organization * * *." 42 U.S.C. Sec. 6903(13)(A). See also House Report, supra note 1, at 37, USCAN 6275 (specific examples of harm to be avoided, including Indian children playing in dumps on reservations); State of Washington Dep't of Ecology v. E.P.A., 752 F.2d 1465, 1469-71 (1985) (RCRA applies to Indian tribes). It thus seems clear that the text and history of the RCRA clearly indicates congressional intent to abrogate the Tribe's sovereign immunity with respect to violations of the RCRA.
 
 B. Exhaustion
 
 13
 The Tribe makes a related claim that even if it is not immune from suit, respect for tribal self-government requires that the plaintiffs initially bring suit in tribal courts. The government defendants endorsed this claim but clearly indicated under questioning that they would not submit to the jurisdiction of a tribal court.
 
 
 14
 The judicial preference for tribal court exhaustion is an adjunct to Congress' general preference for tribal self-government. National Farmers Union Ins. Cos. v. Crow Tribe, 471 U.S. 845, 856-57, 105 S.Ct. 2447, 2453-54, 85 L.Ed.2d 818 (1985). We agree that tribal courts are presumed to have civil jurisdiction over the actions of non-Indians on reservation lands absent the affirmative limitations of federal treaties and statutes. Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 15, 107 S.Ct. 971, 976, 94 L.Ed.2d 10, 21 (1987). See also, Fisher v. District Court, 424 U.S. 382, 388-89, 96 S.Ct. 943, 947-48, 47 L.Ed.2d 106 (1976); Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). Determining the "extent of a tribal court's jurisdiction * * * require[s] a careful examination of tribal sovereignty, the extent to which the sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions." National Farmers, 471 U.S. at 856, 105 S.Ct. at 2454. Our examination of the RCRA leads us to conclude that exhaustion of tribal remedies is not required in this case.
 
 
 15
 The RCRA places exclusive jurisdiction in federal courts for suits brought pursuant to section 6972(a)(1) of the Resource Conservation and Recovery Act.
 
 
 16
 Any action under paragraph (a)(1) of this subsection [as this case is] shall be brought in the district court for the district in which the alleged violation occurred.
 
 
 17
 42 U.S.C. Sec. 6972(a). Accord Middlesex County Board of Union Freeholders v. New Jersey, 645 F.Supp. 715, 719-20 (D.N.J.1986).
 
 
 18
 Moreover, Congress has expressed a preference for prompt federal adjudication of citizen suits to enforce the RCRA.
 
 
 19
 Although the Committee has not prohibited a citizen from raising claims under state law in a section 7002 action, the Committee expects courts to exercise their discretion concerning pendent jurisdiction in a way that will not frustrate or delay the primary goal of this provision, namely the prompt abatement of imminent and substantial endangerments.
 
 
 20
 H.R.Rep. No. 98-198, 1, 98th Cong., 2nd Sess., pt. 1, at 53 (1984), reprinted in 1984 U.S. Code Cong. & Admin.News 5576, 5612 (relating to Pub.L. 98-616, Title IV, Sec. 401, Nov. 8, 1984, 98 Stat. 3268; amending section 6972).
 
 C. The Tribe's Responsibilities
 
 21
 Finally, the Tribe argues that the federal defendants are responsible for cleaning up the dump sites pursuant to the RCRA and other laws. We agree. We do not accept, however, the Tribe's contention that the Tribe possesses no responsibility to help.
 
 
 22
 The district court found that the Tribe established and operated the dumps through the Service. The Tribe also generated waste dumped at these sites. We agree with the district court that the Tribe must share responsibility with BIA and IHS for bringing the dumps into compliance. See, 42 U.S.C. Sec. 6902(3); 42 U.S.C. Sec. 6945(a) (1988 supp.); 42 U.S.C. Sec. 6972(a). In determining the Tribe's share, the district court must consider the Tribe's ability to pay a portion of the costs and still provide essential services to its people.
 
 II. THE FEDERAL DEFENDANTS
 
 23
 BIA and IHS argue that the RCRA does not obligate them to participate in compliance efforts. We disagree. We think that they are obligated to participate by the RCRA and the Snyder Act, 25 U.S.C. Sec. 13.
 
 A. RCRA
 
 24
 The RCRA obligates the BIA and IHS to insure compliance with Environmental Protection Agency regulations. BIA and IHS are admittedly engaged in some activities in violation of the RCRA's open dumping provisions.[3] These activities trigger corresponding obligations in two ways.
 
 
 25
 First, the RCRA prohibits "any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste * * *." 42 U.S.C. Sec. 6945. These agencies are thus subject to court-ordered relief. Section 6961 of the RCRA requires:
 
 
 26
 Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government * * * engaged in any activity resulting, or which may result, in the disposal or management of solid waste or hazardous waste shall be subject to, and comply with, all Federal, State, interstate and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is subject to such requirements * * *.
 
 
 27
 The district court found that BIA and IHS contributed to open dumping on the Reservation by generating solid waste, contracting for its disposal and, in some instances, transporting solid waste to dumps operated in violation of federal law. They were therefore "engaged in activity resulting in the disposal of solid waste" within the meaning of the statute. Thus, the district court has the power to order BIA and IHS to undertake whatever compliance efforts are necessary. 42 U.S.C. Sec. 6961, supra.[4] See also, House Report, supra note 1, at 5, 8; 1976 U.S. Code Cong. & Admin.News at 6243, 6245.
 
 
 28
 Second, the district court held that BIA and IHS were engaged in solid waste management activities in violation of 42 U.S.C. Sec. 6964. 668 F.Supp. at 1340-41. We agree. Section 6964 provides:
 
 
 29
 Sec. 6964. Applicability of solid waste disposal guidelines to executive agencies
 
 
 30
 (a) Compliance
 
 
 31
 (1) If--
 
 
 32
 (A) an Executive agency (as defined in section 105 of title 5) or any unit of the legislative branch of the federal government has jurisdiction over any real property or facility the operation or administration of which involves such agency in solid waste management activities
 
 
 33
 * * *
 
 
 34
 * * *
 
 
 35
 then such agency shall insure compliance with the guidelines recommended under section 6907 of this title and the purposes of this chapter in the operation or administration of such property or facility, or the performance of such contract, as the case may be.
 
 
 36
 The government's main argument on appeal is that neither agency has jurisdiction or management responsibility for the dump sites.
 
 
 37
 The RCRA regulates the activities of even those who do not administer the final dump sites. Parola v. Weinberger, supra note 4, at 960-61 (federal contracts with private haulers). Throughout the RCRA, "[t]he term 'solid waste management' means the systematic administration of activities which provide for the collection, source separation, storage, transportation, transfer, processing, treatment, and disposal of solid waste." 42 U.S.C. Sec. 6903(28). BIA and IHS together collect, separate, transport and dispose of hazardous and non-hazardous waste at their facilities on the Reservation. Therefore, they do have "jurisdiction" over facilities, "the operation or administration of which involves such agency" in the generation and disposal of solid waste. They administer facilities, the administration of which engages them in regulated activities.
 
 
 38
 For these reasons, we agree with the district court's conclusion that, under the RCRA, BIA and IHS must share the blame and responsibility for the conditions of these sites.
 
 B. The Snyder Act
 
 39
 The Snyder Act was passed in 1921 to provide general authorization for BIA expenditures. 42 Stat. 208, 25 U.S.C. Sec. 13. The Snyder Act directs the BIA to expend appropriated funds on, among other things, "the relief of distress and the conservation of health." It requires the BIA to exercise an overriding duty of fairness when dealing with Indians. Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); (a court may order the BIA to expend funds to meet Snyder Act obligations); Fox v. Morton, 505 F.2d 254 (9th Cir.1974).
 
 
 40
 Insofar as the Snyder Act imposes affirmative obligations on BIA to relieve distress and conserve Indian health, BIA's conduct on the Reservation in knowingly contributing to health hazards violated BIA's statutory duty. While BIA is vested with some discretion in deciding how to expend fixed sums toward fulfilling statutory goals, where BIA engages in injurious conduct toward the intended statutory beneficiaries, BIA's duty to remedy the wrong is absolute and is not limited in proportion to their contribution to the problem. Cf., Ruiz, supra at 236, 94 S.Ct. at 1075 (BIA must act consistently with their trust obligations); Pyramid Lake Paiute Tribe of Indians v. Morton, 354 F.Supp. 252, 256-257 (D.D.C.1973) (Secretary of the Interior must administer Reclamation statutes as to minimize adverse impact on Indian Reservations). See also, White v. Califano, 437 F.Supp. 543, 555 (S.D.1977) aff'd 581 F.2d 697 (8th Cir.1978) (per curiam) (IHS must provide care where state cannot).[5]
 
 CONCLUSION
 
 41
 Our holding that BIA and IHS have a duty to clean up the dumps is buttressed by the existence of the general trust relationship between these agencies and the Tribe. See, e.g., United States v. Sioux Nation of Indians, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844, (1980) (takings); Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); Seminole Nation v. United States, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942) (agency responsible for misappropriation by tribal leaders); United States v. Klamath Indians, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938); United States v. Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938); United States v. Creek Nation, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935) (restricting confiscation); Carpenter v. Shaw, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478 (1930) (construing terms of a treaty consistent with trust obligations); United States v. Payne, 264 U.S. 446, 44 S.Ct. 352, 68 L.Ed. 782 (1924) (same); White v. Califano, supra, (IHS responsible for health care costs despite absence of statutory duty). The existence of a trust duty between the United States and an Indian or Indian tribe can be inferred from the provisions of a statute, treaty or other agreement, "reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people." United States v. Mitchell, 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983) (finding trust relation created by statutes authorizing federal control of timber production); Navajo Tribe of Indians v. United States, 624 F.2d 981, 987, 224 Ct.Cl. 171 (1980) ("If * * * the Government means that the document has to say in specific terms that a trust or fiduciary relationship exists or is created, we cannot agree. The existence vel non of the relationship can be inferred from the nature of the transaction or activity.").
 
 
 42
 The provisions of the RCRA require that executive agencies refrain from activities resulting in violations. Congress intended the obligations of BIA and IHS under the RCRA to be exercised consistent with their trust obligation. Accord State of Washington Dep't. of Ecology, 752 F.2d at 1470 (1985). See also, Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918) (construe ambiguous statutes in favor of Indians); Santa Rosa Band of Indians v. Kings County, 532 F.2d 655, 660 (9th Cir.1975), cert. denied, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977) (same). BIA and IHS have not merely violated the RCRA, but, in so doing, they have violated their fiduciary obligation toward the plaintiffs and the Tribe.[6] They are required to insure that the dumps are cleaned up, even if others contributed to the problem and even if the RCRA does not clearly set forth what role BIA and IHS are to play under the statute.[7]
 
 
 43
 Thus, we reject the government's contention that BIA and IHS owe no obligation to the plaintiffs because they merely contracted with the Service for garbage disposal.
 
 
 44
 [T]his Court has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people. * * * In carrying out its treaty obligations with the Indian tribes the Government is something more than a mere contracting party. Under a humane and self-imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, it has charged itself with moral obligations of the highest responsibility and trust.
 
 
 45
 Seminole Nation v. United States, 316 U.S. 286, 296-97, 62 S.Ct. 1049, 1054-55, 86 L.Ed. 1480 (1941).
 
 
 46
 Accordingly, we affirm the district court. We leave for the district court the question of how the costs for cleaning and maintaining the dumps are to be apportioned among the defendants consistent with this opinion. We lift our stay of that court's order that the Tribe, BIA and IHS submit within 120 days a proposal for bringing the dump sites into compliance; the district court may modify this time schedule if it wishes.
 
 
 47
 MAGILL, Circuit Judge, concurring.
 
 
 48
 I concur in part I of the panel opinion, affirming the Tribe's liability, and in part II.A., premising the liability of BIA and IHS on the provisions of RCA. I write separately to express my disagreement with the remainder of the opinion. I do not think that the Snyder Act or the Indian Health Care Improvement Act impose mandatory obligations on BIA and IHS under these circumstances. Thus, I would find no breach of any trust obligation in this case.
 
 
 
 *
 The HONORABLE GERALD W. HEANEY assumed senior status on January 1, 1989
 
 
 **
 The HONORABLE GEORGE C. EDWARDS, JR., United States Senior Circuit Judge, for the Sixth Circuit, sitting by designation
 
 
 [1]
 The House Report explained:
 The Committee believes that the approach taken by this legislation eliminates the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes. Further, the Committee believes that this legislation is necessary if other environmental laws are to be both cost and environmentally effective. At present the federal government is spending billions of dollars to remove pollutants from the air and water, only to dispose of such pollutants on the land in an environmentally unsound manner. The existing methods of land disposal often result in air pollution, subsurface leachate and surface run-off, which affect air and water quality. This legislation will eliminate this problem and permit the environmental laws to function in a coordinated and effective way.
 H.R.Rep. No. 94-1491, 94th Cong., 2d Sess. pt. 1, at 4 (1976) (House Report), reprinted in 1976 U.S. Code Cong. & Admin.News 6238, 6241-42 (USCAN).
 
 
 [2]
 In full, this section allows:
 (a) In general
 Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf--
 (1)(A) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter, or
 (B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transportator, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]
 42 U.S.C. Sec. 6972(a)(1)(A) (1988 Supp.). See also, 42 U.S.C. Sec. 6945(a) (1988 Supp.) (citizen suits available against anyone engaged in open dumping).
 
 
 [3]
 Both federal agencies operate facilities on the Reservation which generate waste. Most of the waste generated at these facilities is transported to tribal dumps by a tribal agency, the Pine Ridge Village Garbage Service. In this case, the two agencies violate the requirements of Section 4005 of RCRA, 42 U.S.C. 6945, in two respects only: one is where employees of the Bureau of Indian Affairs transport solid waste directly to three tribal dumps, and the other is where the IHS at two sites burns waste in open drums. The agencies recognize that these direct violations of RCRA must cease
 * * *
 The IHS contracts with the Pine Ridge Village Garbage Service and has informal arrangements with BIA contractors to remove the solid waste generated at its facilities on the Reservation. These haulers transport the trash to open dumps operated by the Tribe.
 Brief for the Defendants-Appellants, at pp. ii and 13.
 
 
 [4]
 On its face, Sec. 6961 might be construed as a waiver of the government's sovereign immunity only with respect to injunctive or other equitable relief. See McClellan Ecological Seepage Situation v. Weinberger, 655 F.Supp. 601 (E.D.Cal.1986). Because neither we nor the district court have ordered civil penalties, we need not define the exact boundaries of permissible liability under section 6961. Other courts have clearly held that section 6961 permits those steps necessary to the implementation of applicable environmental standards. See e.g., Parola v. Weinberger, 848 F.2d 956, 962 n. 3 (9th Cir.1988). See also, Ohio v. United States Dept. of Energy, 689 F.Supp. 760, 764-65 (S.D.Ohio 1988) (declining to read Sec. 6961 narrowly)
 
 
 [5]
 The IHS is similarly obligated. The Indian Health Care Improvement Act, 25 U.S.C. Secs. 1601 et seq. (IHCIA), was passed in part to address the effects of Indians' "lack of safe water and sanitary waste disposal services." 25 U.S.C. Sec. 1601(f)(6). It authorizes the IHS to expend funds to satisfy "unmet needs for safe water and sanitary waste disposal facilities" to the extent Congress appropriates money for this purpose. 25 U.S.C. Sec. 1632. The IHCIA commits this country, through the efforts of the IHS, to "meet the goal of providing the highest possible health status to Indians." 25 U.S.C. Sec. 1602. We think the IHCIA at a minimum obligates the IHS to refrain from contributing to poor health conditions on the Reservation through indifference to the disposal of the solid waste IHS produces
 
 
 [6]
 The IHCIA was also passed in recognition of the United States fiduciary obligations with similar effect:
 The Congress finds that--
 (a) Federal health services to maintain and improve the health of the Indians are consonant with and required by the Federal government's historical and unique relationship with, and resulting responsibility to, the American Indian people.
 25 U.S.C. Sec. 1601.
 
 
 [7]
 Compare White v. Califano, supra. In White, the district court was required to determine who had a legal duty to care for a mentally ill member of the Tribe. IHS denied responsibility, arguing that the decision should be discretionary because no statute required IHS to provide for involuntary commitment. The court disagreed, finding such a duty in general statutory pronouncements obligating the federal government to provide for Indian health care. 437 F.Supp. at 553-55 (construing the IHCIA). The Court stated in part, "This situation arose, it appears, not from apathy or bad faith but from the uncertain state of the law and the harsh fact that everybody's resources are finite." Id. at 557. The district court was not unmindful that the IHS operated with limited resources. The Court, nevertheless, required the IHS to fulfill its obligations. We think White supports the view that IHS and BIA must share responsibility for the clean-up and maintenance of the dumps