**Pamela Keller McNABB, as Guardian Ad Litem for James McNABB, a minor person, Plaintiff,**

v.

**Margaret HECKLER, Secretary of the Department of Health and Human Services, her agents, employees and successors; Everett R. Rhodes, M.D., Director of Indian Health Service; the United States Department of Health and Human Services; and the United States Government, and J.T. Brownlee, as Director of Roosevelt County Department of Public Welfare, his agents, employees and successors; the Roosevelt County Department of Public Welfare; James Halvorson, Al Harvey, and Al Kashubein, as County Commissioners of Roosevelt County; the Roosevelt County Board of Commissioners; and Roosevelt County, Defendants.**

No. CV-83-051-GF.

United States District Court,
D. Montana,
Great Falls Division.

Jan. 27, 1986.

Steven L. Bunch, Montana Legal Services, Helena, Mont., for plaintiff.

Carl E. Rostad, Asst. U.S. Atty., Great Falls, Mont., James McCann, Co. Atty., Roosevelt County, Wolf Point, Mont., for defendants.

Richard A. Weber, Jr., Hamilton, Mont., Dave Rice, Havre, Mont., for amicus curiae.

HATFIELD, District Judge.

On December 4, 1981, Pamela Keller McNabb, the non-Indian, common law wife

of Raymond McNabb, a Chippewa-Cree Indian, gave birth to James McNabb. At the time of James' birth, which was eight weeks premature, and at the time this action was filed, Pamela and Raymond McNabb resided on the Fort Peck Indian Reservation. Pamela McNabb has applied with both the Indian Health Service ("IHS") and Roosevelt County for payment of the medical bills accrued by herself and son James, who spent considerable time in intensive care. Roosevelt County eventually agreed to pay Pamela's bills. Neither entity has chosen to pay the bills accrued by James. This lawsuit results from the named defendants' refusal to pay those bills. The unique feature to this dispute, however, is that each side refused to pay for the same reason, *i.e.*, because each contends that the other is primarily responsible for payment for the medical services. The federal and county defendants have cross-claimed against each other for summary judgment on the basis that their programs are residual. Plaintiff has taken the position in various comprehensive memoranda that *both* defendants are liable for James' bills, but that the IHS, as the party first approached, should pay. Several Montana counties were allowed to file memoranda as *amicus curiae*. After careful consider of this perplexing issue, the court is prepared to rule.

## LIABILITY OF EACH DEFENDANT GROUP

There can be no dispute that Pamela and James McNabb, as residents of Roosevelt County, and indigent within the meaning of Title 53, Chapter 3, Montana Code Annotated, are eligible, under Montana's general relief laws, for county medical assistance from defendant county. Roosevelt County does not seriously contest this, but instead predicates its position upon the assertion that its responsibility is merely secondary or residual to IHS. Having concluded that the county would ordinarily be responsible for these expenses, the court deems extended discussion unnecessary.

The federal defendants concede, as they must, that "the child, James McNabb, is an Indian eligible for health services from the Indian Health Services (IHS)." (Federal Defendants' brief in support of motion for summary judgment, filed April 13, 1984, at p. 1). In this case, the relevant services consist of IHS contract health care services. 42 C.F.R. §§ 36.21 *et seq.* IHS refuses payment on the grounds that Roosevelt County is primarily responsible, and that IHS' liability is merely residual. Thus we are faced with the unusual dilemma where an individual is apparently eligible for benefits under two programs yet serviced by neither.

This case presents the court with two unfortunate realities. First, both parties to this action are having considerable difficulty making their obviously finite financial resources meet the needs of their respective constituencies. The decision in this case can only darken an already bleak economic picture for one of the defendants. Second, there is a paucity of case law squarely on point. The court is confident, however, that the result achieved herein is most consonant with the relevant statutes and cases, viewed in conjunction with the history of our government's involvement in Indian affairs.

## RESIDUALITY CLAIMS

The basis for Roosevelt County's assertion that it is merely secondarily responsible for James McNabb's medical bills is Montana administrative rule § 46.9.509, A.R.M. That regulation states, in part:

*Medical Resources:* (1) County medical programs are to be considered only after all other medical assistance resources have been determined and, where available, used. Resources include but are not limited to:

    (a) medical assistance (medicaid);

    (b) Indian health services; ....

The federal defendants claim that this rule was repealed prior to the date when Roosevelt County decided to refuse payment of the contested charges. The record reflects that the effective date of repeal was August 13, 1982, that the County's initial decision to deny coverage was made in February, 1982, but further, that this

decision was reconsidered during a period subsequent to repeal. Additionally, the federal group contends that the County is liable because, not having promulgated a state approved county medical assistance plan, said county was required to use Montana's Medicaid eligibility rules, which disallow consideration of IHS as a prior resource. Consideration of these contentions is unnecessary, because the court accepts the premise that Roosevelt County, under different circumstances, would be responsible for payment.

IHS relies on the so-called "alternate resource" rule, 42 C.F.R. § 36.23(f), which provides:

> (f) *Alternate resources.* Contract health services will not be authorized by the Indian Health Service when, and to the extent that, alternate resources for the provision of necessary medical services are available and accessible to the individual requesting the services or would be available and accessible upon application of the individual to the alternate resource.

Alternate resources are defined as:

> ... resources other than those of the Indian Health Service contract health services program, available and accessible to the individual, such as health care providers and institutions (including facilities operated by the Indian Health Service), health care payment sources, or other health care programs for the provision of health services (*e.g.*, medicare or medicaid) for which the individual may be eligible.

Absent the availability of alternate resources, therefore, IHS is responsible for providing medical care and or payment.

Plaintiff's frustration is understandable. Neither defendant can deny responsibility, but neither will accept it. Plaintiff's position, which this court deems entirely reasonable, is that "available and accessible" (federal regulation) and "available" (state regulation) mean *actually* available. She cites several cases, dealing with various public entitlement programs, which support her view. In *Shea v. Vialpando*, 416 U.S.

251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974), the Court invalidated a state regulation which failed to consider *actual* work expenses in computing AFDC benefits, because that regulation merely *presumed* expenses of $30 per month. In *Van Lare v. Hurley*, 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975), also an AFDC case, the Court struck down New York's "lodger" regulations, because "they are based on the assumption that the non-paying lodger is contributing to the welfare household, without inquiry into whether he in fact does so." 421 U.S. at 346, 95 S.Ct. at 1747. A similar regulation was found objectionable in *Lewis v. Martin*, 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); there, the Court held that a step parent could not be considered a bread winner ".. unless bread is actually put on the table." 397 U.S. at 559, 90 S.Ct. at 1286. *See also, Heckler v. Turner*, — U.S. —, —, 105 S.Ct. 1138, 1147, 84 L.Ed.2d 138 (1985).

Research into recent decisions brought this court's attention to the Ninth Circuit holding in *Schrader v. Idaho Dept. of Health and Welfare*, 768 F.2d 1107 (9th Cir.1985), which considered whether real property should be counted as an available resource in computing AFDC benefits. The Circuit Court reversed the decision of the district court, and remanded the matter for consideration of an Idaho regulation which, the court found, failed to adequately weigh whether certain non-liquid assets were reasonably available to the needy family. For present purposes, one aspect of the opinion is especially instructive. The Circuit Court was quite careful to emphasize that it was not attempting to encourage malingering, or to reward AFDC recipients who were not attempting in good faith to find a reasonable market, and price, for their real property. 768 F.2d at 1115. The court merely felt that an assessment of "availability" required some inquiry into the realities of the particular situation. The same can be said here. The record provides ample evidence that Pamela McNabb made considerable effort to obtain medical assistance payments from two par-

ties with statutory responsibility to help her. She went initially, as the mother of an Indian child, to IHS. They sent her "across the street." She went to the County, and they told her to look to IHS. Neither entity discharged its duty. However, in view of the federal government's "unique obligation toward Indians," *Morton v. Mancari*, 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974), discussed *infra*, IHS' initial handling of Pamela McNabb, and steadfast refusal to pay her bills, continuing to date, cannot be upheld.

TRUST RELATIONSHIP

█ This court need not present a treatise on the existence of, or duties arising from, the trust relationship existing between the federal government and the Indian people of this nation. That unique and important relationship exists, and has been recognized at least since the opinion of Chief Justice Marshall in *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 80 L.Ed. 25 (1831), to the effect that the relationship of the Indian people and the United States "resembles that of a ward to his guardian." Subsequent decisions in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832) and *United States v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), were to the same effect. Though Congressional interest and action in the area of Indian health was slow to progress, several legislative enactments over the years have addressed their health needs. *See*, Cohen, *HANDBOOK OF FEDERAL INDIAN LAW*, pp. 696-97. Prompted by the sobering results of several surveys, President Taft sent a special message to Congress concerning the "deplorable health and sanitary conditions on reservations." *Cohen*, at 697, citing S. Tyler, *A History of Indian Policy 107* (Wash.: Gov't Printing Office, 1973). One result was the Snyder Act of 1921, 25 U.S.C. §§ 13, *et seq.* (as amended), setting aside funds for "the relief of distress and conservation of health" of Indians. Though the Snyder Act provides statutory authority for the IHS program, the federal defendants take strong exception with the view that this legislation establish-

es Indian health care as the sole responsibility of the federal government.

This court agrees that neither the Snyder Act nor the federal government's historical involvement with general Indian welfare totally relieves the various reservation states of responsibility for Indians' well being. The express language of Snyder, however, cannot be ignored. In arguing that the Indian Health Care Improvement Act of 1976 ("IHCIA"), discussed *infra*, did not supersede Snyder, the federal group maintains that "the Snyder Act is *still* the basic Indian Health Service authority." They cite to the House of Representatives' report of April 9, 1976, which states that the Snyder phrase "for the relief of distress and conservation of the health of Indians" remains "the basic legislative statement of the Federal Government's obligation to provide health services to Indians." Regardless of whether or not passage of IHCIA was intended to undermine the importance of the Snyder Act, this language from Snyder hardly condones or ratifies the federal government's treatment of Pamela McNabb. It is not necessary that this court adopt the holding of *Bullchild v. Mathews*, No. C75–606V (W.D. Wash.1981), to the effect that the Snyder Act and related regulations create an *entitlement* on the part of Indians to contract health care. *Amicus* persuasively argues this position, but this court need not adopt it when fashioning the relief ordered below. Instead, the importance of Snyder results from two related observations. First, as the Ninth Circuit held more than ten years ago, the Snyder Act was enacted out of the federal government's "overriding duty of fairness when dealing with Indians, one founded upon a relationship of trust for the benefit of" Indian persons. *Fox v. Morton*, 505 F.2d 254, 255 (9th Cir.1974), *citing*, *Seminole Nation v. United States*, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942). As such, the Snyder Act programs must be "liberally construed in their [Indians] favor." *Fox*, 505 F.2d at 255. *Fox* therefore undermines any argument that the federal trust responsibility to Indians arises only where Indian property held in

trust by the federal government is at issue. Second, the court believes that while Snyder may not, *in itself,* create an entitlement in favor of Indians, it cannot be viewed in isolation from the trust responsibility. Accordingly, consideration of Snyder, IHCIA, and the facts of this case must be performed against the background of the federal government's pervasive involvement in Indian affairs.

■ In the well reasoned and lengthy opinion of *White v. Califano,* 437 F.Supp. 543 (D.So.Dak.1977), *aff'd.,* 581 F.2d 697 (8th Cir.1978), the district court did not reject a Snyder/entitlement analysis, but instead relied on IHCIA, because the 1976 enactment was more recent, and "on point." 437 F.Supp. at 558. Briefly, *White* presented the question of whether local government coffers or federal programs would be tapped in supplying emergency mental health care for a seriously ill reservation Indian. The court concluded, *inter alia,* that state and county officials lacked the authority to involuntarily commit an allegedly mentally ill Indian person residing on a reservation. The federal defendants in the case *sub judice* attempt to distinguish *White* from the case at bar on the basis of this first conclusion. All of the other parties to this action, however, urge a complete reading of *White.* Indeed, the court believes that the real importance of *White* lies in its extended discussion of the federal government's trust responsibility to Indians. Further, this court believes that the trust analysis employed in *White* was equally responsible for the result reached therein, to be accorded equal footing with the court's conclusion that local governments had no authority to involuntarily commit mentally ill Indian persons.

The South Dakota court began by citing portions of IHCIA, which provide:

The Congress finds that—

(a) Federal health services to maintain and improve the health of the Indians *are consonant with and required by the Federal Government's historical and unique legal relationship* with, and resulting responsibility to, the American Indian people. (Emphasis ours.)

(b) A major national goal of the United States is to provide the quantity and quality of health services which will permit the health status of Indians to be raised to the highest possible level and to encourage the maximum participation of Indians in the planning and management of those services. 25 U.S.C. § 1601.

IHCIA further provides:

The Congress hereby declares that it is the policy of this Nation, in fulfillment of its special responsibilities and legal obligations to the American Indian people, to meet the national goal of providing the highest possible health status to Indians and to provide existing Indian health services with all resources necessary to effect that policy. 25 U.S.C. § 1602.

After finding that the above-quoted language "is the latest statement of Congress on the trust responsibility of the federal government in relation to Indian tribes in the area of health services," the court found a duty to act on the part of the federal parties, emanating from that trust responsibility "as recognized and defined by statute." 436 F.Supp. at 556–57.

Plaintiff embraces the holding in *White,* and bolsters her position through an impressive discussion of the legislative history underlying IHCIA. Reports and hearing testimony repeatedly refer to IHS as the "primary" provider of Indian health care. Section (g) of IHCIA (25 U.S.C. § 1601(g)) indicates that improved *federal* Indian health services will foster Indians' confidence in those services, which will result in "better Indian health." Health care was described as the "cornerstone" for all other federal programs benefitting Indians. Finally, plaintiff points out that the residuality regulation (42 C.F.R. § 36.21(a)) itself specifically refers to Medicare and Medicaid as possible "alternate resources," with no mention of state or local programs. This specific reference to other federal programs lends credence to the view that the federal government has taken the ultimate

responsibility for Indian health care upon itself, and that this responsibility cannot be sidestepped in the manner attempted here.

Therefore, this court does not find in the trust doctrine, the Snyder Act, or IHCIA, *standing alone*, an entitlement in favor of Indian persons to health care dollars. It does find, however, that those statutes, read in conjunction with the trust doctrine, place the burden, in the first instance, upon the IHS programs to assure reasonable health care for eligible members. This is particularly true where, as here, the federal program was approached initially. As Judge Bogue so succinctly stated in *White*, the question simply becomes whether the federal defendants can abandon the plaintiff entirely. There, given its set of facts, the court found that an individual requiring an involuntary commitment could not be abandoned. Though a mental commitment and resulting jurisdictional impediments are not involved here, the principle remains the same. The policies underlying the trust doctrine, and the holdings in *White* and *Bullchild*, coupled with the clear intention of Congress to provide "the highest possible health status to Indians," as manifested by Snyder and IHCIA, mandate that the federal defendants cannot abandon Pamela McNabb either.

The court acknowledges that this is a difficult issue with no simple answers. Finite resources are involved. The difficult issues inherent in the field of Indian law arise. The result achieved herein best comports with the state of the law as it exists today, shaped by the federal government's many years of dealing in Indian affairs. The better avenue for resolution of disputes of the type presented here rests with the legislative branch. This court can only interpret the limited legislative enactments and statements of Congressional intent available to it. Congress could quickly resolve a question which this court has wrestled with for many months. Unless and until it does so, the ultimate responsibility for this eventuality rests with the federal government, which is also the only entity which can itself solve the problem.

Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED AND ADJUDGED that the federal defendants' motion for summary judgment is DENIED, a similar motion filed by the county defendants is GRANTED, and judgment shall be entered to the effect that the Indian Health Service shall pay the relevant medical bills incurred by James McNabb from its contract care allocation. The question of attorneys' fees shall be considered upon motion by plaintiff.