**Pamela Keller McNABB, as Guardian Ad Litem for James McNABB, a minor person, Plaintiff-Appellee,**

v.

**Otis R. BOWEN, Defendant-Appellant,**

**Roosevelt County; Roosevelt County Board of Commissioners, Defendants-Appellees.**

**No. 86–3711.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 1987.

Decided Oct. 1, 1987.

---

John F. Cordes and Irene M. Solet, Washington, D.C., for defendant-appellant.

Steven L. Bunch, Helena, Mont., for plaintiff-appellee.

Richard A. Weber, Jr., Hamilton, Mont., for defendants-appellees.

Steven C. Moore, Boulder, Colo., for amici curiae Nat. Indian Health Bd. and Denver Indian Health Bd.

Logan T. Johnson, Phoenix, Ariz., for amicus curiae Arizona Health Care Cost Containment System.

Before SNEED and HALL, Circuit Judges, and AGUILAR,[*] District Judge.

CYNTHIA HOLCOMB HALL, Circuit Judge:

We have before us an indigent Indian child, James McNabb, and his mother, Pamela, who ask us to decide who is responsible for the child's health care bills. They are the victims of a tragic paradox: the Indian Health Service (IHS) and Roosevelt County (County) do not deny responsibility for James' health care, although neither will accept it. Both the IHS and the County justify this abdication of responsibility by insisting that the other is "primarily responsible" for the health care of indigent Indians. The district court determined that the burden of responsibility for James' medical bills fell upon the IHS. *McNabb v. Heckler*, 628 F.Supp. 544 (D.Mont.1986). The IHS appealed, and we affirm on other grounds.

I.

Pamela Keller McNabb is the non-Indian, common-law wife of Chippewa-Cree Indian Raymond McNabb. She gave birth to their son James McNabb on December 4, 1981. James was born eight weeks prematurely, and five hours after his birth was flown to a hospital in Billings, Montana. He was hospitalized for approximately six weeks, spending considerable time in intensive care.

At the time this action was filed, Pamela and Raymond McNabb were indigent and resided on the Fort Peck Indian Reservation in Roosevelt County, Montana. Pamela McNabb first applied to the IHS for payment of the medical bills incurred by herself and James. An IHS representative took her to the Roosevelt County Department of Public Welfare and assisted her in requesting payment from the County.

The IHS subsequently refused to pay the McNabbs' bills under 42 C.F.R. § 36.23(f), which authorizes payment only after available "alternate resources" are exhausted. The County also denied her request based on its own "alternate resource" rule, Montana Administrative Rule 46.9.509 (1976).[1] The County later decided to pay those medical bills incurred by Pamela alone. The County's refusal to pay James' bills, however, was overturned on appeal by other state administrative entities, and the Montana Board of Social and Rehabilitation Appeals (Board) ultimately determined that James' bills should be paid by the County. The County filed a petition for review of the Board's decision in Montana state court, although no further action has been taken there due to these proceedings.

Pamela McNabb brought this action on behalf of her minor son James in federal district court against the IHS (including other related federal entities) and the County. She seeks a declaratory judgment determining which defendant is liable for James' bills. The district court granted the County's motion for summary judgment, holding that the IHS has primary responsibility to pay for James' medical bills. *McNabb*, 628 F.Supp. at 544. The district court stated that the IHS' refusal to pay for the medical care of James McNabb based upon its "alternate resource" rule, 42 C.F.R. § 36.23(f), was improper since the IHS, in the first instance, was responsible for assuring "reasonable health care for eligible members." 628 F.Supp. at 549. The district court based this conclusion upon: (1) its finding that the trust doctrine, the Snyder Act, 25 U.S.C. § 13, and the Indian Health Care Improvement Act, 25 U.S.C. § 1601 et seq. (IHCIA), together mandate that the federal defendants cannot "abandon" Indians in McNabb's position; and (2) the fact that Patricia McNabb approached the IHS before she approached the County. *Id.*

II.

The IHS argues on appeal that the district court erred in granting summary judg-

---

[*] Honorable Robert P. Aguilar, United States District Judge, Northern District of California, sitting by designation.

1. This rule was repealed effective August 13, 1982. However, the County continued to apply the rule and subsequently adopted another alternate resource rule, Montana Code Annotated § 53-3-207 (1985).

ment for the County, since the IHS' alternate resource rule is valid and the County has a duty to pay under Montana law. We review the district court's grant of summary judgment de novo. *Squaxin Island Tribe v. Washington,* 781 F.2d 715, 718 (9th Cir.1986).

Specifically, the IHS argues that: (1) on its face, the alternate resource rule is a proper exercise of federal regulatory authority; (2) the IHS' interpretations of the terms "alternate resources" and "available and accessible" do not conflict with the Snyder Act, the IHCIA, or the trust doctrine; and (3) under Montana law, the County was obligated to pay James' expenses. Each of these claims is addressed in turn.

### A.

The IHS' first argument on appeal is that its alternate resource rule is a valid attempt to distribute scarce funds to needy Indians. The alternate resource rule, 42 C.F.R. § 36.23(f), provides:

> Contract health services will not be authorized by the Indian Health Service when, and to the extent that, *alternate resources* for the provision of necessary medical services *are available and accessible* to the individual requesting the services or would be available and accessible upon application of the individual to the alternate resource.

(emphasis added).

The basic authority for this IHS regulation, the Snyder Act, 25 U.S.C. § 13, grants the Bureau of Indian Affairs broad power to supervise and expend congressional appropriations "[f]or the relief of distress and conservation of health" of Indians. *See Rincon Band of Mission Indians v. Harris,* 618 F.2d 569, 570 (9th Cir.1980). The general language of the Snyder Act does not delineate eligibility criteria or distribution guidelines for Indian health programs. *Id.* at 572.

The Supreme Court, in *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), upheld an agency's ability to create reasonable classifications and requirements in order to optimally distribute limited funds appropriated under the Snyder Act among eligible beneficiaries. *Id.* at 230–31, 94 S.Ct. at 1072–73. The Court also provided standards for determining whether an administering agency's regulation is a proper allocation of limited funds under the Snyder Act. *Id.* at 230–36, 94 S.Ct. at 1072–75. Under *Ruiz,* the regulation must be promulgated in a procedurally correct manner. *Id.* This court has interpreted *Ruiz* to also require that the regulation is "rationally aimed at an equitable division of its funds." *Rincon,* 618 F.2d at 572.

■ The County contends that the alternate resource rule does not meet *Ruiz*'s requirements for validity. First, the County argues the rule was not promulgated in a procedurally correct manner. We disagree. The alternate resource rule was promulgated in conformity with the requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 552(a)(1)(D). *Cf. Ruiz,* 415 U.S. at 232–36, 94 S.Ct. at 1073–75 (failure to publish an eligibility restriction other than in the agency's internal operating manual violates the APA). Notice of the proposed rulemaking was published in the Federal Register in 1976. *See* 41 Fed.Reg. 46792 (1976). The final regulation was published in the Federal Register in 1978, and has been included in the Code of Federal Regulations since 1979. *See* 43 Fed.Reg. 34650 (1978); 42 C.F.R. § 36.23(f) (1979). In addition, the IHS has consistently interpreted "alternate resources" to include state programs.[2]

---

2. *See Ruiz,* 415 U.S. at 236–37, 94 S.Ct. at 1074–75 (requiring consistent interpretation). The definition of "alternate resources," published at 42 C.F.R. § 36.21(a), does not specifically include state programs:

> (a) "Alternate resources" means resources other than those of the Indian Health Service contract health services program, available and accessible to the individual, such as

health care providers and institutions (including facilities operated by the Indian Health Service), health care payment sources, or other health care programs for the provision of health services (e.g., medicare or medicaid) for which the individual may be eligible. However, the IHS has made it clear that state programs are included. *See, e.g.,* 41 Fed.Reg. at

The second requirement under *Ruiz* is that the rule be rationally aimed at an equitable division of available funds. *Rincon,* 618 F.2d at 572 (interpreting *Ruiz*). The County argues that the alternate resource rule does not meet this requirement because it places burdens upon only the poorest Indians. The County reasons that the poorest Indians, who would meet the County's more stringent eligibility requirements, are precluded from automatically receiving health benefits from the IHS, while those "richer" Indians who fail to meet the County's requirements may receive IHS benefits without having to first apply to the County. Although this reasoning describes the logical result of the alternate resource rule, it fails to show that the regulation is not rationally aimed at an equitable division of available funds. The requirement of first applying for state assistance may be an inconvenience, but it is not irrational or unfair. It is foreseeable that this required inconvenience could result in more federal funds being available to meet the needs of other Indians.[3] The IHS' alternate resource rule therefore meets the *Ruiz* and *Rincon* requirements of proper promulgation and rationality.

### B.

The next question is whether the IHS' interpretation of the rule's term "alternate resources" to include state and local programs, thereby making its responsibility for Indian health care residual to these programs, conflicts with Congress' goal of providing health care services to Indians. The district court held that the IHS' interpretation was inconsistent with Congress' mandate, since the federal government was responsible "in the first instance" for James McNabb's health care. *McNabb,* 628 F.Supp. at 549.

The resolution of this question turns upon Congress' intent in dedicating resources to the IHS for the purpose of administering Indian health care programs. Our inquiry must first focus upon whether the IHS' view of its responsibility for Indian health care as residual to the states' responsibility is consistent with congressional intent. We review this question de novo, although we give substantial deference to the IHS' interpretation of congressional intent. *See United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977). We must reject administrative regulations which are inconsistent with the statutory mandate or that frustrate the policies which Congress sought to implement. *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); *see also Adamo Wrecking Co. v. United States,* 434 U.S. 275, 279, 98 S.Ct. 566, 570, 54 L.Ed.2d 538 (1978) (regulation must be "within the contemplation of Congress").

As the district court acknowledged, Congress failed to outline the role it wished the federal government to play vis a vis state and local agencies in providing Indian health care. 628 F.Supp. at 549. However, there are three sources which provide insight into congressional intent in this area: the overriding trust relationship between the federal government and the Indians, *see, e.g., Fox v. Morton,* 505 F.2d 254, 255 (9th Cir.1974); the Snyder Act, 25 U.S.C. § 13; and the IHCIA, 25 U.S.C. § 1601 et seq.

When the interests of Indians are involved, we must explore congressional intent from a special vantage point: "[O]ur government has an overriding duty of fair-

---

46793 (state and local programs are alternate resources); 43 Fed.Reg. at 34652–53 (same).

**3.** McNabb also argues that the federal alternate resource rule violates her constitutional equal protection and due process rights by creating an arbitrary classification which discriminates against the poor. Based on the analysis above, we reject this claim. The practical implication of the rule, requiring poorer Indians to first apply to local entities, bears a rational relation-

ship to the legitimate government goal of efficient distribution of limited resources. *See Weinberger v. Salfi* 422 U.S. 749, 770, 95 S.Ct. 2457, 2469, 45 L.Ed.2d 522 (1975) (setting forth the "rational relationship" test); *see also San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973) (wealth is not a suspect classification).

ness when dealing with Indians, one founded upon a relationship of trust for the benefits of these '... dependent and sometimes exploited people.'" *Fox*, 505 F.2d at 255 (citation omitted). This trust relationship is the genesis of the "eminently sound and vital canon," *Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 655 n. 7, 96 S.Ct. 1793, 1797 n. 7, 48 L.Ed.2d 274 (1976), that statutes passed for the benefit of Indians "are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918). *See* Canby, *The Status of Indian Tribes in American Law Today*, 62 Wash.L.Rev. 1, 19–21 (1987) (discussing the rule of "sympathetic construction").

This canon of liberal construction controls in determining congressional intent under the Snyder Act's general assistance program. *E.g., Wilson v. Watt*, 703 F.2d 395, 402 (9th Cir.1983). Turning to the Snyder Act itself, which provides authorization for IHS activity in the Indian health area, we have only broad language; it simply states that the administering agency "shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes: .... For relief of distress and conservation of health...." 25 U.S.C. § 13. *See Rincon*, 618 F.2d at 570 (Snyder Act authorizes IHS health regulations).

In light of this sweeping mandate, we must look further for evidence of congressional intent regarding the extent of federal responsibility for Indian health. The IHCIA, 25 U.S.C. § 1601 et seq., is highly relevant, since it is a more detailed expres-

sion of congressional intent regarding Indian health care. *White v. Califano*, 437 F.Supp. 543, 554 (D.S.D.1977), *aff'd*, 581 F.2d 697 (8th Cir.1978).

Reviewing the text of the IHCIA and the relevant legislative history, one is struck by Congress' recognition of federal responsibility for Indian health care. In the language of the IHCIA itself, Congress declares that in order to fulfill its "special responsibilities and legal obligation to the American Indian people," the nation's policy is "to meet the national goal of providing the highest possible health status to Indians and to provide existing Indian health services with all resources necessary to effect that policy." 25 U.S.C. § 1602.

While there are numerous declarations that federal responsibility for Indian health care is "primary," Congress and the Department of Health, Education, and Welfare (HEW) did not view federal responsibility as *exclusive* and preemptive of state responsibility. This congressional vision of shared responsibility was enunciated in the statement of the objectives of IHCIA set forth in the 1976 House Report: "To assist urban Indians both to gain access to those community health resources available to them as citizens and *to provide primary health care services where those resources are inadequate or inaccessible.*" H.Rep. No. 94–1026, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S.Code Cong. & Admin. News (USCAN) 2652, 2657 (emphasis added).[4] Congress did not view the federal government as the *exclusive* provider of Indian health care benefits. We hold that the IHS' interpretation of the term "alternate resources" to include state and local

---

4. *See also,* Report of the Committee on Interior and Insular Affairs, S.Rep. No. 94–133, 94th Cong., 1st Sess. 90 (1975) (major long term objective is "[t]o serve as the primary provider for special Indian health needs *not met by general service programs*" (emphasis added)); 1976 Report of the Department of Health, Education, and Welfare, H.Rep. No. 94–1026, 94th Cong., 2d Sess. 131, *reprinted in* 1976 U.S.Code Cong. & Admin.News 2652, 2769 ("The [IHS] *within this Department* has primary responsibility for pro-

viding health care services...." (emphasis added)).

In a 1980 report regarding the IHCIA, Senator Melcher of Montana included a statement of Mr. Lythcott, the IHS administrator, wherein Mr. Lythcott specifically states that the IHS had the "primary responsibility for the *Federal* health commitment" to the Indians. S.Rep. No. 96–758, 96th Cong., 2d Sess. 105 (1980), 1980 U.S.Code Cong. & Admin.News 6655 (emphasis added).

programs is therefore consistent with congressional intent.[5]

There remains, however, the crucial question of whether the IHS may view state and local funds as "available and accessible" under the rule when they are legally, although not actually, available. This is the situation before us: the IHS denies responsibility for James' bills because it views the County's funds as legally available to the McNabbs, even though the County refuses to pay.

Once again, this question must be answered in terms of congressional intent and the federal government's overriding trust responsibility. Congress has expressed its desire to provide all assistance necessary to enable Indians to take advantage of non-federal sources of health assistance. The 1976 House Report articulates Congress' goal of assisting Indians in gaining access to community health resources available to them as citizens. House Report, 1976 USCAN at 2657. Consistent with these goals, the IHS has characterized its role as the "principal Federal health advocate for Indian people by assuring that they have knowledge of, *and access to* all Federal, state, and local health programs to which they are entitled as American citizens." Department of the Interior and Related Agencies Appropriations for 1978, Statement of the IHS, Hearings Before a Subcommittee of the House Committee on Appropriations, 95th Cong., 1st Sess. 66 (1977) (emphasis added).[6] In fact, the federal government has apparently "taken on a state or two" to ensure that Indians are given the same privileges as others enjoy as state citizens. Department of the Interior & Related Agencies Appropriations for 1982, Hearings Before a Subcommittee of the House Committee on Appropriations, House of Representatives, 97th Cong., 1st Sess. 172 (1981) (testimony of Dr. Johnson of IHS).

■ In light of the IHS' self-proclaimed and congressionally-designated role as the Indians' advocate and facilitator in ensuring that their health care needs are met, the IHS can not justify its abandonment of James McNabb on the basis of its view that County funds are legally available to him. The IHS acted properly in assisting Pamela McNabb in applying for County funds. This was consistent with its self-described role as "Federal health advocate." From this point on, however, the IHS turned its back on the McNabbs. Pamela McNabb, an indigent, was left to navigate her way through numerous appeals on behalf of her son through Montana agencies, and through the federal courts, searching for relief from the oppressive burden of James' medical bills. This is inconsistent with congressional intent, brought into sharper focus by the trust doctrine. The IHS should have taken up the laboring oar at the point McNabb was denied County funds, since these funds were not actually available. The burden of vindicating its position that McNabb was legally entitled to County funds must fall upon the federal government, not upon indigent Indians. If in fact the County ultimately decides to pay for

---

5. Our interpretation is also consistent with the trust doctrine. The states have enacted numerous laws specifically for the benefit of Indians, such that it is not unreasonable to assume that states would also shoulder part of the health care burden. *See* Cohen, *Handbook of Federal Indian Law* 658 & n. 47 (1982 ed.). Moreover, our interpretation is consistent with the principle that Indians are entitled to the privileges of state citizenry under the fourteenth amendment's equal protection clause. *See, e.g., Apache County v. United States,* 429 U.S. 876, 97 S.Ct. 225, 50 L.Ed.2d 160 (1976), *aff'g mem.* 417 F.Supp. 13, 16 (D.Ariz.1975) (voting rights).

6. We may refer to reports of the congressional appropriations committee for guidance in determining the proper rules for providing Indian health assistance. *See Ruiz,* 415 U.S. at 212–

30, 94 S.Ct. at 1063–72 (appropriations subcommittee legislative history studied); *Adams v. Hodel,* 617 F.Supp. 359, 362 & n. 12 (D.D.C.1985) (recognizing importance of directions from appropriations committee). Statements made by parties integral to the considered bill at committee hearings shed some light on legislative intent. *See, e.g., Chicago & North Western Railway Co. v. United Transportation Union,* 402 U.S. 570, 576, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971) (labor spokesmen's statements regarding Railway Labor Act). *See generally* Singer, 2A *Sutherland Statutes & Statutory Construction* § 48.10 at 318–20 & n. 4 (4th ed. 1984). We may assume that the members of Congress took the IHS at its word in explaining its implementation of IHCIA.

McNabb's medical expenses, the IHS has fulfilled its responsibility to "assure access" to local funds.[7] If the County continues to deny responsibility, the IHS must pay since County funds are not actually available. Any other result is inconsistent with the trust doctrine.

#### C.

The IHS urges us to hold that, as a matter of law, the County must pay the bills of an indigent Indian child such as James McNabb. The IHS argues that the County's residuality regulation violates the federal supremacy clause. The IHS cites *Blum v. Bacon*, 457 U.S. 132, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982), in support of its proposition. In *Blum*, the Supreme Court struck down a New York provision which directly conflicted with a federal regulation which prohibited a state from excluding certain federal aid recipients from its program. *Id.* at 145–46, 102 S.Ct. at 2363–64. Here, Congress has not expressly prohibited a state from establishing its own residuality requirements. The states' power in this area is therefore not preempted. *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979) (supremacy clause may only be violated only if Congress has pre-empted state power positively and by direct enactment) (quoting *Wetmore v. Markoe*, 196 U.S. 68, 77, 25 S.Ct. 172, 175, 49 L.Ed. 390 (1904)).

The IHS also argues that the district court erred in failing to find that under Montana law, the County must pay James McNabb's medical bills. *See McNabb*, 628 F.Supp. at 545–46 (finding that resolution of state law question unnecessary in light of its holding). In this declaratory judgment action, we must exercise our own "sound discretion" to determine the propriety of the district court's decision to decline

to decide whether the County's alternate resource rule is invalid under Montana law. *United States v. Washington*, 759 F.2d 1353, 1356–57 (9th Cir.) (en banc), *cert. denied*, 474 U.S. 994, 106 S.Ct. 407, 88 L.Ed.2d 358 (1985).

"The Declaratory Judgment Act does not grant litigants an absolute right to a legal determination." *Id.* at 1356. We may deny declaratory relief in light of the public interest and when prudential considerations counsel against its use. *Id.* at 1356–57. *See also Moore v. United States House of Representatives*, 733 F.2d 946, 955 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985). In exercising our "sound discretion," we decline to decide whether the County's rule is invalid under Montana law. Our holding that the IHS must take responsibility for McNabb's bills once the County rejects her application affords the McNabbs "relief from [the] uncertainty, insecurity, and controversy" which prompted this declaratory judgment action. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2759 (2d ed. 1983) (quoting Borchard, *Declaratory Judgments* 299 (2d ed. 1941); *Washington*, 759 F.2d at 1357 (citing Borchard with approval). In addition, the state law questions here are both novel and difficult[8] and are involved in the case presently pending before the Montana state court. *See McGraw-Edison Co. v. Preformed Line Products Co.*, 362 F.2d 339, 342–43 (9th Cir.1966) (summarizing bases for refusing declaratory relief).

#### III.

Congress did not intend that the federal government be exclusively responsible for Indian health care. It contemplated that the IHS would aid Indians in taking advan-

---

7. Under these circumstances, the IHS would be entitled to reimbursement from the County for any previous payment of James' bills. *See* Mont.Code Ann. § 27–1–501 (1985) (action may be brought or maintained by representative or successor in interest).

8. Not only are difficult state constitutional issues involved, such as the right to welfare, *see Butte Community Union v. Lewis*, 712 P.2d 1309,

1314 (Mont.1986), but the right to equal protection is also implicated. *See* Cohen, *Handbook of Federal Indian Law* 653–660. In addition, there is little guidance under Montana state law for determining the legality of its alternate resource rule, section 53–3–207. *Cf. County of Blaine v. Moore*, 174 Mont. 114, 568 P.2d 1216 (1977) (federal or county alternate resource rule not addressed).

tage of state and local programs, with the federal government meeting health care needs not met under these programs. In light of this congressional intent and the trust doctrine, the IHS' abandonment of the McNabbs once the County refused payment for James' bills was unjustified. The IHS must now carry the burden of vindicating its position that the County is legally bound to pay for James' care. If the County continues to deny responsibility, the IHS must pay since County funds are not actually available.

AFFIRMED.